# THE STATE v. ROBERT PECK, Appellant.

In Banc, July 2, 1923.

1. **EMBEZZLEMENT: Sale of Collateral Stock: Bailment.** The indictment charged defendant with the crime of embezzlement as bailee in that he had sold certain stock placed in his hands as collateral security for other stock sold to the bailor. The contract recited that a certain company, composed of defendant and another, "have this day sold" certain stock to Eilers "as collateral until resale of same" and had "received" certain other stock and that "it is understood and agreed that all securities carried in this account or deposited to secure the same be carried in our general loans and be sold at public or private sale, without notice, when such a sale or purchase is deemed necessary by us for our protection"; and this agreement was signed by Eilers. *Held*, that there was an express grant of power to defendant's company to sell the stock, and there could be no embezzlement of the stock by the bailee, or of the money for which was sold, for under the contract the defendant had both the right to sell and to appropriate the proceeds to the account of his company, and the State's case fails.

2. ———: ———: ———: **Authority to Sell: Stock or Proceeds.** Where one has authority as agent of another to sell an article on certain terms, and he sells it on those terms and as the property of such other, he cannot be charged with embezzling the article, although there may be a subsequent embezzlement of the proceeds. Where defendant had authority by written contract to sell certain stocks deposited with him, he cannot be convicted of embezzling the stock, and where he sold the stock he cannot be convicted of embezzling the money for which they were sold under an indictment charging him with embezzling the stock. A charge of embezzling stock is not sustained by proof of embezzling money.

3. ———: **Sale of Pledged Stock: Embezzlement: Pledgor and Pledgee.** Where a purchaser buys stock from a stockbroker the relation of debtor and creditor is created, although the stock remains in the hands of the broker; and where the purchaser leaves the stock so bought in the hands of the stockbroker for resale and as collateral on an open account, and adds other stock as security, and authorizes the application of the proceeds of the sale upon the ac-

count, the relation of pledgor and pledgee, and not of bailment, is created; and such being the relation, an indictment of embezzlement by the broker as bailee cannot be sustained.

Appeal from St. Louis City Circuit Court.—*Hon. Robert W. Hall,* Judge.

REVERSED.

*Hudson & Hudson* for appellant.

(1)   The court erred in not sustaining the demurrer of the appellant, which was in the nature of an instruction and offered at the close of the State's case. State v. Cunningham, 154 Mo. 161; State v. Britt, 213 S. W. 425; State v. Moreaux, 254 Mo. 398; State v. Julin, 235 S. W. 818; State v. Hurley, 234 S. W. 820.   (2)   The court erred in allowing witness Lagaman to testify as to similar acts of defendant Austin Peck, when the evidence disclosed that the said acts or transactions of the defendant Austin Peck had not the slightest connection with the transaction at hand and could not show intent, as all the facts were different.   State v. Crosswhite, 130 Mo. 358; State v. Wissing, 187 Mo. 96; State v. Gebhardt, 279 Mo. 708; 16 C. J. 596.   (3)   The giving of Instruction 1 was erroneous.   It is broader than the pleadings and does not conform the proof as to the defendant, as there was no evidence before the court that he was bailee of Jordan Eilers, nor was there any proof that he had converted the stocks to his own use or sold them and then converted the proceeds to his own use.   State v. Hurley, 234 S. W. 820.   (4)   Instruction 7 does not conform the proof because it requires the jury to find that Eilers, the prosecuting witness, demanded the return of his stocks from Robert Peck and there is no evidence in the case to show that he ever made any demand on Robert Peck for the return of the stocks he placed in Austin Peck's hands. State v. Britt, 213 S. W. 425.

*Jesse W. Barrett,* Attorney-General, and *Albert Miller,* Assistant Attorney-General, for respondent.

(1)   The court did not commit error in overruling appellant's demurrer to the evidence; and in submitting the case to the jury. The record discloses that there was substantial evidence, connecting appellant with the offense charged, upon which to submit the case to the jury. State v. Betz, 207 Mo. 589; State v. Castleton, 255 Mo. 201, 208; State v. Britt, 213 S. W. 426; State v. Hurley, 234 S. W. 824; State v. Stevens, 281 Mo. 639. (2)   The court did not commit error in admitting testimony tending to show that co-defendant Austin Peck committed similar fraudulent crimes, near the same time and place. (a)   This testimony was competent to show intent. State v. Myers, 82 Mo. 558, 562; State v. Foley, 247 Mo. 607, 635; State v. Patterson, 271 Mo. 99, 109; State v. Wilcox, 179 S. W. 480. (b)   Appellant did not request an instruction confining and limiting the jury in the consideration of this testimony. (3)   The court did not commit error in the giving of Instruction No. 1. State v. Thompson, 144 Mo. 314, 317; State v. Obuchon, 159 Mo. 256, 259; State v. Betz, 207 Mo. 589, 603.

GRAVES, J.—Austin Peck, Jr., and Robert Peck were jointly indicted by the grand jury of the city of St. Louis, for the crime of embezzlement by a bailee. In the view we have of the case a short statement will suffice.

Peck & Company (alleged to be composed of the two parties above named) was selling Dayton Coal, Iron & Railway stock to one Jordan Eilers of Gillespie, Illinois. There were several of these transactions. The transactions were not cash, but upon account, and Eilers was putting up collateral. The collateral agreements ran thus:

"Peck & Company, Investment Bankers. Merchants-Laclede Building, St. Louis, Mo. July 28th, 1920. M. Jordan Eilers, Gillespie, Ills. We have today SOLD

YOU the following stocks: Shares: 1500. Stock Dayton Coal Iron & Ry. Price $3.25. Amount $4,875.00. Commission—Net Amount $4,875. As collateral until resale of above. TERMS: Received 20 shares of Insurance Corporation. Loan Value $500. 10 Shares Insurance Corporation. 60 Shares Pfd. Liberty Systems, and 100 Shares Common Liberty Systems. Kindly O. K. & return. Signed Jordan Eilers. (Lower left hand corner.) It is understood and agreed that all securities carried in this account or deposited to secure the same be carried in our general loans and be sold or bought at public or private sale, without notice, when such a sale or purchase is deemed necessary by us for our protection."

The indictment was for the embezzlement of stocks received under the foregoing and similar instruments. The prosecuting witness, Eiler, says that he executed the foregoing and other contracts. He said that the 30 shares of Insurance Corporation were delivered under his particular contract. The indictment covers 30 shares of the Insurance Corporation, 160 shares of the Liberty Systems Corporation and 10 shares of Gillespie Coal Company.

Upon trial both defendants were convicted, but we are only interested in Robert Peck, the only defendant before this court. From a judgment and sentence of two years in the penitentiary he has appealed. At the trial he demurred to the evidence adduced by the State, and stood upon his demurrer. For our purposes the foregoing will suffice. There was a mass of testimony of things said and done both before and after the written contracts. Of this in the opinion.

I. This is an indictment for an embezzlement by a bailee, and not one for obtaining property by trick, fraud or false pretenses. The defendant before us stood upon his demurrer to the evidence, and the question is whether or not the State made out a case of embezzlement by a bailee. As said in our statement there is a mass of evidence tending to show what transpired before the rela-

tionship of bailor and bailee actually arose, if in fact under the written instrument set out above, it ever arose. Much of this testimony is without probative force under the instrument before us. Whether it would be of probative force under a different charge is not of interest in the determination of the instant case. The vital question is, did the State have any substantial evidence to support *this* indictment?

II. The character of the transaction between Eilers and Peck & Company is gathered from the written memoranda of contracts, signed by Eilers, and his testimony relating thereto, so far as his oral testimony is pertinent and probative. There were three transactions between the parties, which cover all stock desposited with Peck & Company by Eilers.

The first was on July 8, 1920, and in this instance there was a written memorandum, in words as the one we have set out, except the stocks were different. The second was on July 20th, and of this the witness Eilers says: "I told him I was not desirous of buying any more stock for the fact that I didn't have any more money to put up. He agreed to take more of my securities to serve as collateral, which he accepted, and I also stated that I didn't know the value of the Dayton Coal, Iron & Railway stock, and he said that he would accepted (accept) it on the same plan that he had with me on the previous transaction."

The foregoing is Eilers' version of the transaction of July 20th, which was by phone from Austin Peck to him. In this phone message Austin Peck was offering Eilers 1500 more shares of Dayton Coal, Iron & Railway stock. So whatever was done on July 20th was done under the same agreement and arrangement as that of July 8th, which was done under a memorandum in writing in the exact form of the one which we have set out in full.

However, this case is more particularly bottomed on the transaction of July 28, 1920, the written memo-

randum of which is found above. Of this transaction, the witness Eilers says: "A.    Mr. Holmes came and got the stock. Q.    Did you know Holmes to have been employed in the office of Peck & Company? A.    I didn't know him until he introduced himself as one of the firm. Q.    And you gave the stock to a man by the name of Holmes, did you? A.    Yes, sir. Q.    What stock did you turn over to him? A. Under date of July 28th? Q. Yes, sir. A.    I turned over 100 shares of Liberty System, common, and 60 shares of Liberty System, preferred, 10 shares of the Gillespie Coal Company stock, and *30 shares of the Insurance Corporation.*"

The foregoing covers all the stock involved in the indictment before us, and as said this is the transaction upon which this indictment is founded. In the briefs it is said that there were three joint indictments against the two Pecks, one for each of the transactions. As shown, the deposit of stock by Eilers with Peck & Company was upon the same terms in each instance, so that it makes no difference out of which transaction the present indictment grew. It was, however, out of the transaction of July 28th, as shown by the whole course of trial. These are really all the pertinent and probative facts shown by the State. When we say pertinent and probative, we mean under an indictment for embezzlement by a bailee. We are not discussing what might be pertinent and probative under other and different charges.

An indictment for the crime charged in the present case concedes the lawful possession of the property by the bailee. So, in the instant case, if the foregoing facts make out a bailment, we must determine whether or not there has been a conversion without the assent of the bailor. But there is the further question as to whether or not there was a bailment at all. Of the latter in due course.

III.    To get the status of Eilers' and Peck Company, we must resort to the contract. It will be remembered

that these were not cash transactions. The contract says: "We have to-day sold you the following stocks: Shares: 1500-stock Dayton Coal Iron & Ry. Price $3.25. Amount $4,875. Commission. Net amount $4,875. *As collateral until re-sale of above.*"

This so far shows an account between Eilers and Peck & Company, with the stock sold to Eilers, held as collateral to the account.

The memoranda contract (signed by Eilers) then further continues: "*Terms*: Received 20 shares of Insurance Corporation, Loan value $500, 10 shares Insurance Corporation, 60 shares Pfd. Liberty System, and 100 shares Common Liberty System. Kindly O. K. and Return. It is understood and agreed that all securities carried in this account, or deposited to secure the same be carried in our general loans and be sold or bought at public or private sale, *without notice,* when such a sale or purchase is deemed necessary for our protection."

This contract fairly construed means that Eilers has opened up an account with Peck & Company by the purchase of 1500 shares of Dayton Coal, Iron & Ry. stock in the sum of $4,875, which stock was left with Peck & Company for resale and as security for the account. The account was, in fact, first started by the transaction of July 8th. The latter portion of the contract not only covers the stock above mentioned, but the additional collateral as well. The first portion refers to the 1500 shares sold to Eilers, by the express reference "as collateral until *resale of above.*" The "above" was the 1500 shares of Dayton Coal, Iron & Ry. stock. By the latter portion of the contract it is said "all securities carried in this account or deposited to secure the same be carried in our general loans" etc. This portion covers all stocks involved in the account. Not only so, but this portion explicitly authorizes the sale of all the stock involved in the account "when such sale is deemed necessary *by us* for our protection."

If the deposit of this stock be called a bailment, it is one for the specific purpose of resale as to the 1500

shares, and sale as to other stocks, the proceeds to be applied first to the discharge of the account. The parties can undoubtedly fix the terms of the bailment. [State v. Betz, 207 Mo. l. c. 602.] But be this as it may, there being an express grant of power to sell, there can be· no embezzlement of the stocks by the bailee. [9 R. C. L. p. 1276, sec. 16.] It is there said:

"Where one has authority as an agent of another to sell an article on certain terms, and he sells it on those terms and as the property of such other, he cannot be charged with embezzling the article, although there may be a subsequent embezzlement of the proceeds."

To like effect is McCrary v. State, 51 Tex. Crim. 502, l. c. 505, whereat it is said:

"If the sale had been made of the organ as the property of Maxfield and under authority from Maxfield, and there was a subsequent conversion of the proceeds, appellant might have been convicted of embezzling the proceeds of such sale as the property of his principal."

The defendant was not charged with anything except the embezzlement of named stocks. He was not charged with embezzling money. A charge of embezzling money is not sustained by proof of embezzling stocks, nor is the charge of embezzling stocks sustained by proof of embezzling money. [State v. Castleton, 255 Mo. 211; State v. Mispagel, 207 Mo. 557.] The contract gave him power of sale, and therefore he had the assent to sell. He likewise had the right to apply the proceeds of sale. So whether· we agree with the contention of defendant to the effect that the relationship was debtor and creditor, or with that of the State, that the relationship was that of bailor and bailee, we come out at the same hole, i. e. that the State failed to make a case under, the present indictment. The contract in this case authorized not only the sale of the property held, but the application of the proceeds. Of all the stock purchased by Eilers, over $14,000 worth, only $703 was paid on account· by Eilers.

The State makes no showing that even the proceeds were embezzled, because defendant had both the right to sell and to appropriate the proceeds to the account of Peck & Company. But even if such proof had been made, the embezzlement of the money would not sustain this indictment. [State v. Castleton, and State v. Mispagel, supra.] So that even if it is said that the facts make out a case of bailor and bailee, rather than one of debtor and creditor, the State's case fails. The relationship of bailor and bailee usually presumes the honest possession of the property by the bailee. The crime of embezzlement by the bailee cannot well begin before the relationship is established or created by the possession (actual or constructive) of the property by the bailee. We need not therefore further speculate upon the particular relationship. We will, however, look at the other side of the case.

IV.   There is substantial authority to the effect that there was not the relationship of bailor and bailee in this case. The relationship of pledgor and pledgee is announced as the real situation of the parties. Thus in Lamprecht v. State, 95 N. E. (Ohio) l. c. 657, it is said:

"It is manifest that at the time when Ellsworth tendered his check to the cashier of Lamprecht Bros. & Co. the order for the purchase of the stock, which he had given just one week before, had been fully carried out, except as to the delivery of the stock, and in that particular it remains unexecuted to this day. What were the legal relations and rights of the parties at that time? Ellsworth had paid nothing, not even a margin, on the purchase. Nevertheless he had such a property right in the stock, whether it had been bought in his name or not, that he could claim it as his own, subject to the lien of the brokers for advances and commissions; for, as it is said upon good authority in 26 Am. & Eng. Ency. Law (2 Ed.) 1057: 'The client is the owner of the stock purchased on margin from the time of the purchase, and is entitled to its possession at any time upon de-

mand and payment of the broker's commissions and the balance due thereon.' Now if this is the law when the broker advances only ninety per cent of the purchase price when he fills a customer's order, no valid reason appears to us why it should not be the law when, upon the request of a customer, the broker buys the stock for the latter and advances all of the purchase money. 'The ordinary margin paid on opening an account with a broker—that is, in ordering him to buy or sell securities —is ten per cent. The margin may be less than this, or frequently none is advanced, according to the confidence which the broker has in the ability of the client to respond to ultimate loss. But whether the broker advance all or only the principal portion of the sum invested in the securities, the relation of the parties is unchanged. The fact exists that the broker looks to the principal for an indemnity upon the entire transaction. . . . Upon the whole, while it must be conceded that there are apparently some incongruous features in the relation, there seems to be neither difficulty nor hardship in holding that a stockbroker is a pledgee; for, although it is true that he may advance all or the greater part of the money embraced in the speculation, if he acts honestly, faithfully, and prudently, the entire risk is upon the client, and may be enforced against him as a personal liability, irrespective of the value of the securities which are the subject of transaction. To introduce a different rule would give opportunities for sharp practices and frauds, which the law should not invite.' [1 Dos Passos on Stock Brokers & Stock Exchanges (2 Ed.) 182, 196.]

"'The broker acts in a threefold relation: First, in purchasing the stock he is an agent; then, in advancing money for the purchase, he becomes a creditor; and, finally, in holding the stock to secure the advances made, he becomes a pledgee of it. It does not matter that the actual possession of the stock was never in the customer. The form of a delivery of the stock to the customer, and a redelivery by him to the broker, would have constituted a strict, formal pledge. But this delivery and

redelivery would leave the parties in precisely the same situation they are in when, waiving this formality, the broker retains the certificates as security for the advance. The contract is in spirit and effect, if not technically and in form, a contract of pledge, and is governed by the law of pledges.' [Jones on Pledges (2 Ed.) sec. 496.]

"It is expressly decided by the New York Court of Appeals, in Content v. Banner, 184 N. Y. 121, 76 N..E. 913, that when a stockbroker buys securities for a customer, although he advances the whole amount necessary for the purchase, instead of requiring a margin, the relation of pledgee and pledgor exists between the parties."

So in the case at bar when Eilers bought the stock the relation of debtor and creditor was created. When he left this stock for resale and as collateral, and added the other collateral, the relationship of pledgor and pledgee was created. He pledged the stock to secure his debt, and authorized its sale for application upon the debt. In such situation, there was not the relationship of bailor and bailee, and an indictment of embezzlement by bailee would not be supported by such evidence. So under either horn of the dilemma, the State has failed in its case, under this particular charge, and from such charge the defendant should stand discharged. Even if it can be said that a pledgee, or holder of collateral securities, fall within the terms of Section 3329, Revised Statutes 1919 (a question of grave doubt), yet it must be said that such pledgee has a limited title to the property, and his limitations as to its use would be either governed by the applicable law, or by the contract of pledge—in this case by the contract of pledge, which carried the right of sale, and the application of the proceeds.

The foregoing obviates the discussion of all other questions urged by defendant.

The judgment is reversed and defendant discharged. All concur, except *Walker, J.,* who dissents.