[Crim. No. 3636. In Bank.—April 26, 1934.]

THE PEOPLE, Respondent, v. E. K. FLEMING, Appellant.

Clare Woolwine, John S. Cooper, Cooper & Collings and Harold W. Judson for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and Frank Stafford, Deputy District Attorney, for Respondent.

THE COURT.—Upon consideration of this appeal, we hereby adopt as the opinion of this court herein, the following opinion heretofore prepared by Mr. Presiding Justice Conrey for the honorable District Court of Appeal, Second Appellate District, Division One:

"Appellant, with two others, was brought to trial before the court, without a jury, on several charges of grand theft, as stated in counts one, three, four and five of the indictment. At the trial the action was dismissed as to the co-

defendants Philips and Glanz, and count five was dismissed. Defendant Fleming was found guilty on counts one, three and four. He appeals from the judgment, and from an order denying his motion for a new trial.

"In the first count of the indictment it was alleged that on or about April 1, 1930, the defendants and each of them did unlawfully take certain personal property of John L. Brandt, being two $1,000 bonds issued by the kingdom of the Serbs, Croats and Slovenes. In the third count it was alleged that on or about May 2, 1930, the defendants did unlawfully take away ten shares of the capital stock of the Chrysler Motor Car Company, of the value of $591.25, the personal property of G. G. Stewart. In the fourth count it was alleged that on or about May 3, 1930, the defendants did unlawfully take away ten shares of Chrysler Motor Car Company, of the value of $500, the personal property of Mrs. M. A. Stewart.

"The evidence shows that the crimes charged, if they were committed at all, were committed by embezzlement. E. K. Fleming & Co. was a corporation authorized to transact business as a broker in this state. Stock & Bond Guarantee Co. was a corporation authorized to transact business as a broker in this state. Defendant Fleming was the president and actively engaged in the management of E. K. Fleming & Co., which company at the time of these transactions was the principal owner and in control of the Stock & Bond Guarantee Co. Fleming also occupied a like position in relation to this latter company. The several transactions out of which these embezzlement charges grew took the form of purchases of corporation stocks, or agreements for such purchases, from or by agency of one or the other of these brokers and their several customers,—Brandt in the first count, G. G. Stewart in the third count and Mrs. M. A. Stewart in the fourth count; and subsequent sales (or supposed sales) of shares of stock by, or through the agency of, said brokers or one of them, for account of their said customer Brandt.

"The several grounds of appeal upon which defendant relies are, that on each count the evidence is insufficient to sustain the decision; that the court erred in admitting in evidence certain books and other documents; that the court erred in overruling defendants' objections to certain in-

competent and hearsay evidence; that the court erred in denying defendants' motion for a new trial. The principal questions of law presented by counsel herein relate to the obligations of a broker arising from the deposit of securities in marginal transactions, and to the personal criminal liability of an officer of a corporation for misappropriation of property delivered to the corporation.

"First count. (Brandt case.) It is contended that the evidence is insufficient to sustain the decision. On or about March 28, 1930, John L. Brandt called at the office of Stock & Bond Guarantee Company, and there met Jack Williams, sales manager, who represented the company in the ensuing transaction. Brandt delivered to Williams, for the company, a check for $100 to apply on the purchase of certain stocks, and signed two contracts, numbered 3388 and 3389. These contracts were admitted in evidence (Rep. Tr., pp. 13 and 628), and are before the court. They are agreements signed by Brandt, on printed forms of the Stock & Bond Guarantee Company, showing sales by the company to Brandt, of described shares of stock, and the payment by him of certain small amounts on account of the purchase price. It is in evidence that it was orally agreed between the company (by Williams) and Brandt, that the bonds delivered by Brandt to Williams for the company were to be used as collateral but were not to be sold. It is appellant's contention that these were merely marginal sales in which the company was Brandt's broker; that is to say, that the broker was to buy for Brandt, and pay for, the shares of stock; that thereby the broker would lend to Brandt that portion of the purchase price not covered by Brandt's cash payment. As security for this loan the broker would hold, as collateral, the purchased shares, together with the bonds received from Brandt. Taking this as the effect of the contracts as a whole, we have the further fact on April 1, 1930, Brandt ordered additional stock purchases, gave a check for $200, and deposited the two bonds described in the indictment herein. Brandt testified (Rep. Tr., p. 19) concerning this transaction, as follows: 'I told him I didn't wish to have those bonds sold; I wanted them for further protection to the purchase. . . . He said that would be all right; he would see they would not be sold. Q. Did you say anything to Williams, that you would furnish any additional margin,

in case it was called on the purchase of this additional stock? A. I think that question was discussed, and I told him that, if necessary, I could supply additional.'

"Nevertheless, the evidence is that on the same day when the bonds were delivered by Brandt to Williams, that is, on April 1, 1930, the Stock & Bond Guarantee Company, by Fleming as its president, borrowed $1,200 from Western National Bank, and used these bonds as security therefor; also, that the borrowed money was credited to the general account of the Stock & Bond Guarantee Company in the bank. Some weeks later, a receiver of the Stock & Bond Guarantee Company was appointed. Brandt then made inquiries, and for the first time was informed that the bonds had been used as above stated. Then, finding no other way to recover the bonds, he redeemed them at the bank by paying the amount of the loan. It further appears that the stocks which had been purchased on Brandt's order had been 'sold', or at least reported to him as sold, as directed by him, and that the transactions showed a profit. There had been only one call on him for further payment or security, after April 1st, and he had complied with that demand. Before any receiver had been appointed, Brandt's indebtedness to the broker had been paid, and Brandt was entitled to have the Serb bonds returned to him.

"On the facts, which in substance were as above stated, the question is presented: Was there an embezzlement of the Serb bonds by the Stock & Bond Guarantee Company, and by appellant as its acting officer in the loan transaction at the Western National Bank?

"It is contended by appellant that under the facts of this case there could be no embezzlement. The theory as stated, in substance, is that when the broker executes an order, in a marginal transaction, he is the customer's agent, buying from or selling to a third party; and that when he provides funds to complete the order and to carry the securities purchased, he deals with his customer as a principal, advancing his own money and retaining the customer's property as security, with all the rights and obligations which attach to an ordinary loan of money on the security of personal property. The precise point is that in order to embezzle, one must be a fiduciary agent, and that in the course of business of a broker for a customer in a marginal trans-

action the broker holds the customer's securities as a creditor holding property in pledge, and not as an agent of the customer. Counsel points to the following statement by Meyer on 'The Law of Stockholders and Stock Exchanges' (p. 331), where the writer said: 'The broker has the right, as a matter of law, to rehypothecate his customer's securities for an amount not in excess of the customer's indebtedness against such securities. This right exists with respect to securities which the broker has purchased for the customer on margin, as well as with respect to securities which are initially deposited by the customer as margin.' Criminal cases are cited which seem to apply the stated rule to prosecutions for embezzlement. Among these are *Buddeke* v. *State*, 31 Ohio Cir. Ct. 529; *State* v. *Peck*, 299 Mo. 454, [253 S. W. 1019].

▮ "The general rule is that as between a pledgee and his pledgor, the pledgee's application of pledged bonds to his own separate use in excess of his rights as pledgee is an illegal conversion of the property. When there has been such conversion and the pledgee has failed to comply with demand made upon him for return of the bonds after payment of the pledgor's debt, 'there can be no doubt that from that moment there existed a wrongful conversion amounting to embezzlement'. (*People* v. *Tambara*, 192 Cal. 236 [219 Pac. 745].) ▮ The question at issue here is thus made to depend upon the particular question as to whether or not in this case it has been proved that the broker, acting through or with participation of the defendant, applied Brandt's bonds to his own use in excess of its rights as pledgee. It may be that, in accordance with the authorities relied upon by appellant, if the Stock & Bond Guarantee Company had actually purchased for Brandt the stocks ordered by him, as in good faith was required by the nature of the transaction, it would have had the right to pledge the Serb bonds as security for a loan at the bank; subject, of course, to Brandt's right to have them returned to him whenever his indebtedness to the broker was paid. But there is evidence which justified the court in finding that no such purchase of stock for Brandt was actually made, and that the conditions which might have authorized the use which was made of the Serb bonds did not exist. In the brief for respondent we find a careful analysis of

608

the sales records of the Stock & Bond Guarantee Company, and of E. K. Fleming & Co., which appears to accurately summarize the evidence in the record as taken from the books and documents of those corporations. The books also show extensively that these transactions shown in the brief are exemplars of a similar method of doing business, as extensively carried on by these corporations, and by the defendant as their principal executive officer. There was evidence sufficient to show, as stated by counsel for respondent, that in reality there was no purchase or sale of the ordered stocks, and no money advanced for the customer. Each order seems to have been handled entirely as a bookkeeping transaction between Stock & Bond Guarantee Company and E. K. Fleming & Co. and the defendant E. K. Fleming. It follows that neither the defendant or either of his said companies acquired any interest in the securities placed in their hands by Brandt, and that their use of such securities for the purpose of raising money for themselves would constitute grand theft on the theory of embezzlement. The so-called sales were of the character commonly known as 'wash' sales, and were in themselves illegal. (Const. of Cal., art. IV, sec. 26.)

■ "Appellant assigns as error that the court overruled his objections and received in evidence the before-mentioned books and other records which constitute the numerous exhibits to which in part we have referred. Without going into a detailed description of these documents, let it suffice to say that they were properly received because they furnished appropriate evidence to establish the very facts which, as we have seen, were necessary to develop and establish the precise and crucial fact that the right to pledge Brandt's bonds did not exist. If there were any errors in rulings upon the objections made, assuredly they were of minor importance, and without appreciable effect upon the result of the action.

■ "It is further contended by appellant that there is no proof whatever that he knew of the limitations or restrictions upon the right of Stock & Bond Guarantee Company to pledge the bonds at the time when he caused such pledge to be made, or at all. But there can be no doubt that appellant was the actual and active manager of both companies; that he employed the subordinates through whom

he conducted the business of both companies; that 'daily sales sheets' were given to him; that he knew not only in general but largely in detail the manner in which the business was being transacted. The receiver, MacLeod, testified that when he told appellant that various persons were claiming that they had paid up for stock which should have been bought 'and that they had bought stock on contracts that were supposed to be bought at the time they bought it; and I asked Mr. Fleming what the condition was. He said, "You know as well as I do". I said, "What do you mean by that?" He said, "There is about a quarter of a million short we haven't bought stocks."'' We think that the evidence is sufficient to justify the inference that at the time when Brandt's bonds were pledged to the bank, appellant knew that the bonds were being wrongfully used in that way. (*People* v. *Epstein*, 118 Cal. App. 7 [4 Pac. (2d) 555].)

▋ "Counts three and four of the information differ from the first count in that the thefts charged relate to shares of stock purchased through the broker and not to securities deposited by the customer. The two Stewart transactions described in the counts three and four, and the evidence concerning them, are substantially alike. The customer at the time of ordering the shares to be purchased for him paid an installment on account of the purchase price, and from time to time made further payments until the full purchase price was paid, but the stock never was delivered. It is contended by appellant that the evidence is insufficient to prove that the broker ever had actual possession of the stock, and therefore is insufficient to establish the *corpus delicti* of the crime charged. We are in agreement with the contention that the evidence fails to show that the broker ever had actual possession of the stock. On the contrary, in the Stewart transactions, as in the Brandt transactions, it might fairly be inferred from the evidence that the broker never purchased the shares of stock which he was supposed to be buying for the customer. The actual embezzlement consisted in the taking of the money of the Stewarts, and applying it to the broker's own use without completing the transaction as in due course of business its agreement with the customer required it to do.

▋ But appellant further contends that on an information

charging theft of described shares of stock he cannot be convicted of theft of the money paid on account of the purchase. It is contended that this would be a fatal variance between the allegations and the proof. To this the reply seems to be sufficient that such difference between the description of property taken as stated in the information, and the evidence showing property actually taken, is provided for by the Penal Code, as amended in the year 1927. 'When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient· certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, or of the place where the offense was committed, or of the property involved in its commission, is not material.' (Pen. Code, sec. 956.) The plain intention here is that when the offense itself is described with sufficient certainty in other respects to identify the act, a conviction thereof may be sustained notwithstanding the fact that the description of the property stolen as shown by the evidence is different from the property stolen described in the information. We, of course, do not mean to say that one crime may be charged in the information and an entirely separate crime relating to other property, or relating to an entirely different transaction, may be proved, or that a conviction thus obtained could be sustained. There must be some evidence that the acts constituting the offense of which the defendant is convicted are substantially the same as those referred to in the charge contained in the information. There must be at least such degree of identity between the allegations in the indictment or information, and the facts produced in evidence, that when the defendant has been once in jeopardy by reason of such charge he shall be fully protected from another prosecution for the same offense. ██ Applying this test to the case at bar, it is our opinion that the conviction of the defendant in accordance with the evidence in this case is entirely sufficient to protect him from any subsequent prosecution for theft either of the described shares of Chrysler stock or of the moneys paid by the Stewarts covering the purchase price thereof.

██ ''In each of the two Stewart transactions the purchaser made payments which in the aggregate constituted the full purchase price and entitled the customer to the

delivery of the stock which was supposed to have been purchased for him, or her. But appellant contends that since no one of the payments thus made on account of said purchase was of an amount exceeding the sum of $200, therefore he could not in any event be guilty of any crime greater than petit larceny. It appears, however, that these payments of successive instalments upon a single contract did amount to more than $200 on each contract. The exact time when the misappropriation was completed is not material and perhaps is not established by the evidence, more than that the installments were paid at certain specified times and that the stock was not delivered when the payments had been completed and delivery was due. We think that the case is controlled by the rule stated in *People* v. *Sing*, 42 Cal. App. 385, 396 [183 Pac. 865], where it was said: 'The law is that if the different asportations from the same owner are prompted by one design, one purpose, one impulse, they are a single act, without regard to time.' Or as was said in *People* v. *Hatch*, 13 Cal. App. 521, 534 [109 Pac. 1097]. 'It may happen that an aggregate amount may finally be appropriated by one act which was received in many items and at different times.' "

The judgment and order are, and each of them is, affirmed.

Rehearing denied.