In the Matter of CHARLES MARVIN, an Attorney.

Third Department, December 28, 1917.

**Attorney and client — application to discipline attorney — promotion of mining scheme by attorney and others — fraud — evidence — equity.**

Upon an application to discipline an attorney it was charged that in a mining scheme he had defrauded his clients and associates, and that in an action resulting from the collapse of the scheme he committed perjury in his testimony and in the bill of particulars of his time and expenses. It appeared that a promotion agreement and a subsequent syndicate was formed by several persons, including the attorney, for the promotion of a scheme for the purchase of mines, and that said attorney was sent by the managing committee to investigate the mines, and while there made a deposit from money intrusted to him in order to keep an option alive; that said money was a portion of the cash paid by the sole subscriber. to the underwriting agreement, and that his associates, upon the collapse of the scheme, sought to compel him to repay this money.

*Held,* on all the evidence, that there being no satisfactory proof of any fact showing any bad faith or wrong upon the part of said attorney, the petition should be dismissed, unless within twenty days the judgment against him in an action by the other members of the syndicate is discharged and pending actions against him discontinued. If said acts are done, then the attorney is ordered to cancel a judgment which he has obtained against the other promoters and to pay his *pro rata* share of the expenses of the scheme.

Since the members of the committee were in a joint enterprise, in effect, a copartnership, in buying, financing and disposing of the mines, their acts and duties are a proper subject for settlement in a court of equity.

The attorney in this proceeding can be convicted only for an intentional fraud, an intentional and wicked violation of his professional duties, and in determining said question the court must consider his acts and motives with reference to the situation as it existed and the injury his clients are suffering from his wrongful acts.

APPLICATION to discipline an attorney.

*Robert D. Batterson,* the petitioner, in person.

*Herbert C. Mandeville,* for the respondent.

KELLOGG, P. J.:

This application to discipline an attorney results from "a get-rich scheme gone wrong." The charge is that in

a mining scheme he defrauded his clients and associates, and that in an action resulting from the collapse of the scheme he committed perjury in his testimony and in the bill of particulars of his time and expenses. The respondent, at the hearing, moved to dismiss the charges upon the ground that they were insufficient in form and substance. The court dismissed all of the charges except those above mentioned.

It appears that in an action brought by the attorney against the petitioners and others, their associates in the scheme, each party had an opportunity to prove the facts relied upon. This court required the production of the judgment roll, the minutes and the papers used upon that trial, and any further documents and briefs they might wish to present, and is to determine whether the facts can be reasonably gathered from them or whether it will appoint a referee to take further testimony in the premises. After a careful examination, it seems that very little can be added to the record in that case and the facts now before the court, and that a reference to take proof is, therefore, unnecessary. The conduct and the rights of the parties so fully appear from the record that the court may now determine whether the attorney is guilty of such intentional wrong as to justify it in punishing him.

In August, 1907, one Pratt, a mining promoter, was at Elmira selling Canadian mining stocks. He succeeded in interesting the attorney, the petitioner, Mr. Jones, Mr. McLeod and Mr. Wait in Nevada mining, with the result that they sent Pratt to Nevada to find a mine and obtain an option, and furnished him about $500 to cover the expenses of his trip. Upon his return he brought a contract or option upon certain alleged mines, from one McClelland, on which he claimed to have paid $1,000, and he required an additional $200 to cover his expenses. The money was raised by the parties and paid him. The parties, other than Pratt, met and organized as a managing committee, and made a promotion agreement by which they were to be interested in the scheme in proportion to the amount severally contributed by them, it being agreed that the share of the attorney was $125 for services rendered, including the preparation of the underwriting agreement. He contributed no cash.

An underwriting agreement was prepared which recited that Batterson, as trustee, for himself, Jones, McLeod, Wait and others, their associates, held a contract for the purchase of the mines and were entitled to a delivery of the deed upon the payment of $21,125 and one-fifth of the stock in the mining company to be formed. The parties signing the underwriting agreement were to contribute $30,000 in the amounts signed by each. Batterson, McLeod, Wait and Jones were made the managing committee for the syndicate and the moneys received under the agreement were to be used for the payment of the cash portion of the purchase price, incorporating the company " and such other expenses as may be necessary or proper in order to carry out the intention of this agreement." It provided that by the time said sum was fully subscribed, the committee was to cause to be incorporated the Red Jacket Mining Company of Nevada, with a capital stock of 1,000,000 shares of $1 each, and that the mine should be turned over to the company, together with all moneys received from the members of said syndicate not expended as provided in the agreement and that the same should pay for 200,000 shares of the stock to be delivered to the owners and 300,000 shares to the members of the syndicate. The other 500,000 shares were to be treasury stock. The syndicate shares were to be sold at not less than twenty cents a share and the proceeds distributed *pro rata* from time to time among the members of the syndicate. The agreement, among other things, provided:

" *Thirteenth.* The conveyances hereinbefore referred to having been made subject to examination and approval by counsel retained by said Managing Committee, it is understood that unless the said conveyances or such others as may be substituted shall be found to be good and sufficient conveyances of all the mining and mineral rights referred to, and said contracts or such others as may be substituted, to be in accordance with the mining practices and the Laws of the State of Nevada, subscriptions hereto shall be promptly returned in full."

It is important to remember that Batterson, McLeod, Wait and Jones and others were the managing committee for the promoters, and that Batterson, McLeod, Wait and

Jones were the managing committee for the syndicate when formed.

It was agreed by the managing committee of the promoters that Marvin should go to Nevada, inspect the deeds left in escrow there, make such an investigation and examination of the property and matters connected therewith as to him seemed best in the interest of the promoters, and if the title was satisfactory to approve of it. The committee was to pay his expenses and the reasonable value of his services. Five hundred dollars was raised by the members of the committee, other than himself, for his expenses, each paying $100. It was arranged by Pratt and Batterson that Wenzel, a mining engineer, was to meet Marvin at Winnemucca, the county seat of the county where the mines were, and render him assistance. After meeting Wenzel, examining the mines and the title, Marvin discovered that Wenzel was the agent of McClelland, the owner who had made the contract or given the option to Batterson, and he very properly watched Wenzel's movements with suspicion. Marvin discovered that the posting of the mines was not properly made, and required a change in that respect. He found certain defects in the title which were to be made good; he inquired into mining properties and their value in the vicinity and became satisfied that the title was about to be made good but that it would take some days to bring it about. The alleged owner, McClelland, did not in fact own all of the mines but had an option on some of them which was about to expire with Burtelt, who was unwilling to continue the option unless he became satisfied that there was some prospect of a sale and that Marvin and his clients had real money, and he required that $400 be deposited in the local bank in escrow as a condition of continuing the option, to which Marvin assented. The deposit agreement was carefully drawn, apparently by Marvin, and was to the effect that the money was subject to Marvin's order all the while and could only be used upon his order thereafter given to pay a part of the purchase price of one of the contract mines if the purchase was made by his clients.

Before Marvin left Elmira one Mulford subscribed the syndicate agreement and actually paid $1,000 in cash. He

Third Department, December, 1917.      [Vol. 180.

was the only one who ever signed the agreement or paid anything on account of it. The rights which were held by Batterson under the contract would expire within a few days after Marvin left Elmira unless $3,000 was paid at the Nevada bank where the deeds were in escrow, or a renewal negotiated. The managing committee gave to Marvin a draft payable to his order for the Mulford $1,000, believing that circumstances might arise by which it must be paid in order to keep the contract alive and give an opportunity to the committee to raise the balance. It was, however, understood by Marvin and the committee that the money could only be used under the 13th clause of the underwriting agreement after the title was approved of by the attorney.

Pratt had been employed by the committee to obtain the underwriting in the vicinity of Elmira, and the life of the scheme it was felt depended upon his ability to effect such underwriting.

Marvin, after examining the mines, refused to approve of the title unless the price was reduced from $20,000 to $10,000, and the owner required time to consult the others interested before he could enter into that agreement, but after much delay gave a new contract for $10,000 and some stock, which was made upon condition that Marvin arrange with Burtelt to keep his option to McClelland alive until the committee acted upon the option. Knowing that McClelland's title was, or was about to be made good, and in order to keep alive the Burtelt option, Marvin deposited $400 of the Mulford money in the bank under the agreement before mentioned. This was not a misappropriation of that money so far as the promoters were concerned, for they gave it to Marvin to apply upon the purchase price of the mines if it became necessary in order to continue the contract. And furthermore, in effect, it did not change his right to the money.

Marvin was in Nevada as a member of, and as counsel for, the promoters' managing committee, and received money as such, and used the $400 fairly within the direction of his clients and associates, and is guilty of no misconduct with reference to it so far as they are concerned.

As matter of fact Pratt had not paid $1,000 on the option, and the contract price from McClelland was $10,000 and

not $20,000, but Pratt, McClelland and Wenzel, his agents, had caused $20,000 to be written in the contract and an acknowledgment of the receipt of the $1,000 for the purpose of defrauding the managing committee. After Marvin refused to approve the title at $20,000, but was willing to approve of it at $10,000, and McClelland required time for consideration, McClelland telegraphed to Pratt, with the result that at about that time Pratt ran away and has not since been heard of by the committee.

Wenzel claimed that he had performed certain services for Pratt of the value of $700, and that Pratt had told him that this would be paid when Marvin arrived, and also claimed reimbursement for two or three days' expenses while he was waiting for Marvin. Marvin paid about $90 expenses on account of the Burtelt option, and agreed to bring the other matters to the attention of the committee when he arrived home. Wenzel had no just claim against the committee or Marvin; whatever he had done was for McClelland, or for Pratt, in their joint effort to victimize the committee.

Marvin became satisfied that the World-Breaker mines, a part of the same property, were essential to the success of the contract mines, and obtained a separate option upon them for $5,000. He reported the negotiations to the committee and it seemed to meet their approval. But whether he exceeded his authority in that respect is not very material because he carried on the negotiations while waiting for the decision of McClelland and expended only a few dollars.

Upon returning to Elmira Marvin first learned that Pratt had run away. The promoters were then in despair and abandoned the scheme. He thereupon demanded the return of the $400 from the bank, but it neglected to pay him for a while, and Wenzel thereafter attached it, claiming to hold it for what Pratt owed him and his expenses while waiting for Marvin. The committee took some steps to contest the Wenzel claim and incurred an expense of $175 in so doing, which is a proper charge upon the managing committee of the promoters. Wenzel and his attorney succeeded in obtaining all of the money from the bank, except $65, which remains there.

After the scheme collapsed Marvin rendered a bill to his

associates, crediting himself with the $400 on deposit and charging himself the $600 remaining, and tried to get an adjustment with the committee, failing to do which he tendered to it the small balance of the money on hand and has kept the tender good. As between Marvin and Mulford he had no right to retain the $600; but he treated it as money coming to him from the promotion managing committee, and as the members of that committee have settled with Mulford's estate, no wrong is done if it be treated as the property of the committee so far that as between them he is not required to pay it over while his services and expenses remain unpaid. If Mulford or his estate, while unpaid, was pressing the charge here against Marvin, a different situation might be presented, which we are not now called upon to consider.

The committee questioned various items in Marvin's expense account, and claimed that much of the service rendered by him was beyond his authority. It contends that his sole duty in Nevada was to examine the papers at the bank and the clerk's office and determine whether the title was satisfactory. This is improbable in itself, for if the action of the committee was to rest solely upon the regularity of the papers, it would not have sent a lawyer to Nevada, but for a few dollars would have obtained certified copies of them and an abstract of the title. It contends that he had no right to ferret out the fraud on the part of Wenzel, McClelland and Pratt — that he had no right to investigate the mine and to buy it for $10,000 instead of $20,000. That contention answers itself. It is evident that his version as to his duties is the correct one; that he was not only to examine the title, but, when there, to ascertain the facts relating to the mine, its title, its value and the mining business in that locality and to represent the committee in the matters in which it was interested. The evidence of Batterson and of McLeod, of the committee, upon that subject, is improbable, and in addition we find that after they had settled with Mulford and paid his estate $1,000, and taken a receipt for the settlement and a pretended assignment of that claim, they verified an answer denying, in substance, that the Mulford claim had been assigned or was held in their interest. They, therefore, stand before the court as discredited, and wherever Marvin's evidence

is disputed by them alone, his version may properly be found to be the correct one.  Wenzel, with whom Batterson and McLeod are still dealing in mines, and who came across the continent to swear in their interest, stands before the court discredited.  He and his associates were attempting a deliberate fraud upon the committee, and he assisted Pratt in obtaining $1,000 wrongfully and he for himself obtained some of its money by very questionable means.  Wenzel's evidence is not sufficient to convict Marvin of wrongdoing where Wenzel and Marvin disagree as to the facts.

It is unnecessary to take up the various items of expense or services questioned.  Those matters were quite fully investigated in the action and should have been settled there, and would have been so settled except for the position taken by the petitioner and his associates.

Mulford, by signing the syndicate agreement and paying $1,000 to the managing committee, did not become a syndicate, and the committee had no right to turn his money over to Marvin for use for any purpose until the syndicate was formed and sufficient money raised to pay for the mine and obtain the property for which the moneys under the syndicate agreement were first applicable.  Marvin, as the attorney, should have informed the committee of its duties with reference to those moneys; but he and the committee misconstrued the syndicate agreement and understood that if the title was approved Mulford's money could be used to apply upon the purchase price.  This was a mistake, but they acted in good faith.

Batterson, McLeod, Jones and Wait have settled with the Mulford estate for the wrong done it, and have taken in their interest a pretended assignment of his claim.  Marvin's bill for services and expenses and the claim of Batterson and his associates for moneys paid to Mulford's estate are now simply questions of adjustments between the members of the managing committee; no one else is interested in them and the uncontradicted evidence shows that Marvin is able to respond for any balance found due from him.

Some of the members of the committee brought an action against Marvin for conversion of the $1,000, which in some

way resulted in a judgment in Marvin's favor. We infer that another action is pending for a like purpose. In 1911, after Mulford's estate had been settled with and paid, Marvin brought an action in the Supreme Court against Batterson and the other associates alleging, in substance, all the facts with reference to the joint adventure herein stated; that Wait and Batterson were insolvent; that actions had been brought and others threatened and that the associates had accused him and caused it to be believed that he had wrongfully taken and used their money, and alleged further that his associates had repaid the Mulford money and settled with his estate therefor, and had taken a pretended assignment in the name of another, unknown to him, but in their interest, and he made John Doe a party as representing such assignee, and asked to have it adjudged that he had a lien on the Mulford moneys for the amount due him, and he sought an accounting and other relief. The complaint fairly contemplated an adjustment of all the matters growing out of the mine. Batterson and McLeod and Jones answered and demanded a dismissal of the complaint and also an accounting with the plaintiff. At the trial they took the position that the plaintiff's only remedy was in an action at law and that an equitable action would not lie, and the court adopted their contention and dismissed the complaint. Their position then was and now is that if they owe anything to Marvin on account of the matters, he may sue them. That, of course, would be useless on account of the Statute of Limitations and the insolvency of Batterson and Wait. Such a result manifestly would be unfair. We infer that an appeal has been taken by the plaintiff from that judgment; nevertheless Batterson, one of the parties, presses this matter upon the court, and it must be decided without regard to whether it may or may not influence the decision of that appeal or the trial of that action, if a new trial is granted.

Marvin stands here as the attorney for the committee and a member of the committee and a participant in the joint enterprise. Any gain or loss from the scheme comes to him and to each associate according to his proportionate share. It is manifest that the expenses and the value of Marvin's services on the western trip are not all to be paid by the other

members of the committee but that he must stand his proportionate share, which fact he recognized in his account rendered in October, 1907. It is also apparent that the moneys paid to the Mulford estate must have similar treatment. The moneys expended to defend the Wenzel attachment, the moneys remaining in the Nevada bank and the money tendered relate to the joint account. If there is money due to Marvin, he could not sue each member of the committee for a proportionate share, but must bring an equitable action against all the members engaged in the joint enterprise for an adjustment of the joint account. In legal contemplation the members of the committee were in a joint enterprise, a copartnership in buying, financing and disposing of these mines, and their acts and duties· growing out of the joint enterprise are a proper subject for settlement in a court of equity.

A judgment dismissing the plaintiff's complaint upon the ground that he could not have equitable relief is binding upon the parties until reversed. That is not very material here on an inquiry based upon the allegation that Marvin has acted dishonestly and in bad faith and defrauded his clients. Those questions are to be settled by considering the acts done by him and the intent with which they were done. They do not rest upon the technical question whether or not an equitable or a legal action is the proper remedy in a certain case, or whether certain acts may or may not constitute a technical conversion of money without regard to intent. Marvin can be convicted here only for an intentional fraud, an intentional and wicked violation of his professional duties, and in determining that question we must consider his acts and motives with reference to the situation as it existed and the injury his clients are suffering from his wrongful acts. He was apparently always willing to meet his just obligations with his associates, but they insisted he alone must repay the Mulford money. They intended to make him stand the loss on account of the Wenzel attachment although they wished Wenzel upon him. It is evident that if Marvin had repaid Mulford, his associates would have avoided all liability to him as far as they were able. The evidence indicates that they were attempting to shirk their

legal obligations and to compel him to meet the losses which should fall upon all. The petitioner is not in a very favorable position to ask that the summary power of the court be used to discipline an attorney for his acts, done in good faith, and which were necessary to compel his associates to be honest with him. They are not the victims of his wrongs, but he has compelled them to meet their just obligations. He brought an action to have the rights and liabilities of each party determined, but upon technical grounds they prevented such an adjustment. They have in fact paid a little more than their share. They never have requested any adjustment upon a fair basis, but have prevented it.

We conclude that Marvin performed very valuable services for the committee in Nevada; that he acted in entire good faith and well within his authority and in their best interests, and that he is entitled to reasonable compensation for his services, considering the time spent and the value of the services performed. There is no satisfactory proof of any fact showing any bad faith or wrong upon his part. The committee authorized the use of the Mulford money when the title was approved by him; he approved the title, but he and the committee were wrong in assuming that the Mulford money could be used at that time. There is no satisfactory evidence that his accounts were fraudulent or unfair; his explanation of them is reasonable.

A fair statement of the account between Marvin and his associates and clients may be made as follows: His original bill, rendered in October, 1917, is substantially correct, except that it overlooks the fact that certain liabilities existed against the managing committee, a part of which he must pay, namely, the indebtedness of $1,000 to Mulford and the expenditure by the committee of $175 in the Wenzel attachment case. Sometime in 1911 certain members of the committee settled with Mulford's estate for $1,000 which, with interest at five per cent, now amounts to about $1,350. Adding interest at five per cent to the $175 paid by the committee makes the amount of that item about $282.50. There are assets belonging to the committee of $65 in the Nevada bank and the $7.50 tendered by Marvin. This leaves an indebtedness against the committee of about $1,560, which

should be charged upon its members according to their respective shares as fixed by the promotion agreement. We may consider, for the purpose of doing justice and for this motion only that there remains in Marvin's hands of the Mulford money a sum sufficient to pay his share of these liabilities. It is in the interest of justice, and of all parties interested, that this unseemly controversy should end. The court has power to compel action on the part of Marvin, but cannot here and now compel the other promoters to meet their just obligations in the premises. The legal rights and duties of the respective parties are too plain to justify further consideration.

The petition is, therefore, dismissed, unless within twenty days the judgment against Marvin in the action referred to is discharged and the pending litigations against him discontinued. If those acts are done, then within twenty days thereafter Marvin is ordered to cancel the judgment he has obtained against Batterson and others; to give to Batterson, as chairman, an order for the moneys in the Nevada bank and in the Elmira bank on tender, and pay to the other promoters a sum equal to his *pro rata* share of said $1,560, and if he fails or neglects to do those acts within twenty days, application may be made to the court for its further order.

All concurred, except SEWELL, J., not voting.

Petition dismissed, unless within twenty days the judgment against Marvin in the action referred to is discharged and the pending litigations against him discontinued. If those acts are done, then within twenty days thereafter Marvin is ordered to cancel the judgment he has obtained against Batterson and others; to give to Batterson, as chairman, an order for the moneys in the Nevada bank and in the Elmira bank on tender, and pay to the other promoters a sum equal to his *pro rata* share of said $1,560, and if he fails or neglects to do those acts within twenty days, application may be made to the court for its further order.