[L. A. No. 17656. In Bank. May 1, 1942.]

HAROLD L. DAVIS, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Morris Lavine for Petitioner.

Claude Minard, Guy Richards Crump, Louis W. Myers, B. E. Ahlport and Paul Vallée for Respondent.

THE COURT.—This proceeding was brought to review the recommendations of the Board of Governors of The State Bar that the petitioner be disbarred from the practice of law.

The petitioner's difficulties arose out of his dealings with Mrs. Marie Monast, who was arrested and placed in jail on a charge of possessing narcotics. Through a man named Evans, a self-styled "bouncer" in a Hollywood night club, she employed the petitioner and another lawyer to represent her. To secure the payment of their fee of $2,000 she pledged with them three diamond rings having a value in excess of that amount. Two of those rings were left in the possession of the petitioner; the third was deposited with his associate.

The petitioner signed a typewritten receipt for the two rings he received which, as originally written, recited that they were deposited as security for attorneys' fees "and bond." When the receipt was offered in evidence, a line had been drawn through the words "and bond."

Davis procured a bail bond from a surety company and Mrs. Monast was released from jail. She paid the premium on the bond. The attorneys' fee was paid in three instalments, the last of which was made on May 26, 1937, to the petitioner's associate, who, at that time, returned to Mrs. Monast the ring which she had left with him.

On July 19, 1937, when Mrs. Monast failed to appear for trial in the superior court, the bond was forfeited. Later, upon representations of Davis that she was ill, the matter was continued one week. She was then tried and convicted. She immediately filed an application for probation, which was granted the same day. A condition of probation was that she should leave California and not return. After a few days she sailed for Honolulu. Upon this disposition of the case her bond was exonerated.

On July 17, 1937, Irene Davidson and Catherine Wall were arrested and jailed in Los Angeles on charges of grand theft. They, too, through Evans, retained Davis and his associate as counsel. Shortly after their arrest, Davis filed a petition for a writ of habeas corpus and secured their release on bail by posting a bond of $1,000 for each one of them. These bonds were secured by Davis from the same surety company which had posted bail for Marie Monast. When arraigned in the municipal court, the bail of each defendant was increased to $3,500. This they were unable to furnish, and in consequence they were remanded to the county jail where they remained until they were convicted and sentenced.

When these two women were arrested, Marie Monast had paid

the premium on her bond and all of her attorneys' fees in her case. One of the rings which she had pledged had been returned to her. On the day after she was to appear for trial, the petitioner pawned for $350 the two diamond rings which he had in his possession. Approximately two months after Mrs. Monast left for Honolulu, Davis sold the pawn ticket for $200, and the purchaser subsequently redeemed the rings from the pawn broker. Thereafter Mrs. Monast brought a replevin action against Davis to secure possession of the rings. Davis then repurchased the rings and after the institution of the disciplinary proceedings against him, returned them to her.

All of the facts which have been stated stand undisputed. But there is a direct conflict between the petitioner and Mrs. Monast concerning the agreement under which she pledged the rings with him. He testified that when he signed the receipt for the rings the words "and bond" had not been crossed out. Mrs. Monast testified positively that she refused to accept it until this was done.

In further explanation of his action in disposing of the jewelry the petitioner testified that "they were to be returned to her when the bond was either exonerated or otherwise had been disposed of and the fee had been paid." He also testified that he represented Catherine Wall and Irene Davidson upon the representation of Evans "that he had talked to Mrs. Monast and that she was willing to take care of their case and for me to come and get them out [of jail]." Later, he said, he talked with Mrs. Monast and told her Tom Evans had called him in connection with the case of these women. "And did she indicate," he was asked, "in any wise whatsoever that she was not going to be responsible for their bond and attorneys' fees?" "No," was his reply. "If she had, I wouldn't have gone ahead with them." According to his testimony, he told Mrs. Monast "in the beginning" that his fee would be $250 for each woman and that he was going to keep the jewelry. But he also related a conversation he had with Mrs. Monast at the county jail when "she apparently was highly dissatisfied and said that these two girls were dissatisfied the way the preliminary hearing had been handled; said they were going to get other counsel and that she didn't intend to pay for their fee or bond."

The testimony of Mrs. Monast, taken by deposition, is in direct contradiction to that of petitioner. She said: "I never

talked to Mr. Davis concerning Catherine Wall and Irene Davidson. . . . I am positive that I never told Harold L. Davis, or anyone else, that I would pay the fees for [them] . . . or either of them, as I had no reason for assisting these women. . . . I never told [them] . . . that I would be responsible for their bonds, or attorney's fees at any time in the county jail in Los Angeles, or any place else.''

The charges made against the petitioner are that he improperly disposed of the diamond rings pledged with him, that he filed a false and improper cross-complaint in the replevin action, and that he gave false testimony in a deposition taken in connection with that litigation. The local administrative committee of The State Bar before whom the issues were tried found in petitioner's favor on all charges with the exception of that concerning the allegations of the cross-complaint. On that issue it found that such allegations were due to the error of Davis' associate in preparing the cross-complaint and through the careless conduct of the petitioner in signing a verification of it in blank. Upon these findings the committee recommended that Davis be given a private reprimand. When the Board of Governors received the findings and recommendations of the administrative committee it set a time at which the matter would be heard and notified the petitioner to appear and show cause why a greater degree of discipline than that fixed by the committee should not be recommended to the Supreme Court. Following the hearing, at which the petitioner testified in his own behalf, the board adopted findings of fact contrary to those of the committee and recommended his disbarment.

Petitioner contends that without a trial de novo the Board of Governors was without jurisdiction to do more than accept the determination of the local administrative committee. But the State Bar Act requires the Board of Governors to make findings of fact in all disciplinary proceedings resulting in a recommendation to the Supreme Court for disbarment or suspension. (§ 6080, Bus. & Prof. Code.) In fulfillment of this duty, the board may adopt or reject the findings of a local administrative committee in whole or in part and it may also take additional evidence and make other findings. (See *Smallberg* v. *State Bar*, 212 Cal. 113 [297 Pac. 916]; *Sawyer* v. *State Bar*, 220 Cal. 707 [32 P. (2d) 369].) The authority given the board by section 5043 of the State Bar Act

to take additional evidence without a trial de novo would have no purpose if the board, after hearing that evidence, could not make additional findings or findings different from those of the committee.

The conclusion of the Board of Governors that the petitioner violated his oath as an attorney at law and is guilty of conduct involving moral turpitude rests upon its findings that although the agreement of Mrs. Monast, to secure the performance of which she had pledged the rings, had been fully performed, Davis sold them as his own property; that he testified falsely upon the taking of his deposition concerning the transaction; and that he swore to certain allegations in a cross-complaint which were false and untrue. In reaching its decision, the Board of Governors considered not only the record of the proceeding before the local administrative committee, but also the testimony of the petitioner given when this record was under review.

The State Bar recognizes the rule that in a disbarment proceeding the intendment should be in favor of the accused attorney. But it insists that, deciding every question of fact upon which there was the slightest conflict in testimony in favor of the petitioner, his testimony shows that he embezzled his client's property and in his deposition in the replevin suit committed perjury. His testimony also shows, says The State Bar, that as a basis for his defense to that suit, he endeavored to induce the bail bondsmen to falsify their records concerning the bonds of Wall and Davidson. It also contends that the record justifies its finding that the petitioner's verification of his cross-complaint was not an inadvertence.

The circumstances under which Davis disposed of the rings were related by Irving Glasser. He declared Davis told him "he had these rings in pawn, that he wanted to dispose of the ticket, and thereby sell the rings." His testimony is uncontradicted, and is corroborated by that of the petitioner, who stated in his deposition that when he sold the ticket to Glasser it was understood the latter could "take it and sell it or do as he pleased with it." And on cross-examination in this proceeding, the petitioner stated that his transaction with Glasser "was just an ordinary sale." Assuming that Mrs. Monast had told the petitioner she would pay for his services in behalf of Catherine Wall and Irene Davidson and that he might hold her rings therefor, he had no authority to sell the

rings without notice to her. ▮ The law required him to give her notice and a reasonable opportunity to redeem her property. ▮ The petitioner admits that she had demanded the return of her rings and that he gave her no notice whatever of their sale. Under these circumstances, it conclusively appears from his own testimony, that he embezzled his client's property. (*People* v. *Fleming,* 220 Cal. 601 [32 P. (2d) 593] ; *People* v. *Tambara,* 192 Cal. 236 [219 Pac. 745].)

▮ In dealing with the property pledged by his client, the petitioner's professional duty required him to act toward her in the utmost good faith as well as to comply with the law concerning bailments. ▮ An agreement between an attorney and his client by which the attorney receives any advantage is presumed to be void and the burden is upon the attorney to prove that the client freely entered into the agreement. The record in the present case shows, without contradiction, that Mrs. Monast, because of her addiction to morphine, was not responsible at all times between her arrest and her departure for Honolulu; indeed, the petitioner testified that on one occasion when he talked with her concerning the rings, she had not fully recovered from the effects of the drug. Moreover, when Mrs. Monast demanded the return of the rings and commenced suit against him, he attempted to justify his actions by having the books of Irving Glasser, the bail bond broker who procured the bail bonds of Irene Davidson and Catherine Wall, show a charge of $500 for them, instead of $200, which was the premium fixed at the time they were issued. But neither the original premium nor the increased amount was ever charged to the petitioner.

▮ By a verified cross-complaint in the replevin action, the petitioner pleaded a cause of action for an attorney's fee of $500 and an additional $500 for bail bond premiums. He admits that these allegations were untrue. His excuse for the falsification, as stated before the Board of Governors, was that he signed the pleading in blank. But it is significant that this explanation was not made when the petitioner's deposition was taken in the replevin case. Nor did he justify his action upon that ground when he testified before the committee. At that time he said he did not read the cross-complaint very well before he swore to it. He was then asked if it was possible that he had signed the form of verification before the cross-complaint was prepared. His reply was: ''If I did that, I am

still wrong anyway. . . . As a lawyer, if that was done, I wouldn't get another lawyer into trouble.''

The Board of Governors was not obliged to accept the petitioner's last explanation of his conduct and it found that "the allegations of said cross-complaint were wholly false and were known by said Harold L. Davis to be false when he verified the same.'' His own testimony and that of Irving Glasser fully support this finding.

Concerning the charge of perjury, the petitioner testified by deposition, taken in connection with Mrs. Monast's replevin action, that he had delivered the rings to the bail bond company as security for its bond. But the evidence in regard to the rings after they were left with him by Mrs. Monast shows conclusively that his testimony was false. According to the petitioner, Mrs. Monast's bail was forfeited on July 19th. On the same day, the judge who made that order refused to set it aside but he agreed to finally dispose of the bail matter on July 26th, the date to which Mrs. Monast's case was continued when she failed to appear. The petitioner also testified that he pawned the rings at the Provident Loan Company on July 20th, the day after the court had ordered Mrs. Monast's bail forfeited.

From this evidence it appears that the petitioner not only did not deposit the rings with the bonding company as collateral security for the bond, but that he pawned them and converted the money to his own use at a time when the court had forfeited the bail. They came into the possession of Irving Glasser, the bail bond broker, at a later time, but this was in a personal transaction between him and the petitioner, and after Mrs. Monast's bail had been exonerated. Under these circumstances, the conflict between the testimony of the petitioner when he was examined upon the taking of his deposition and when he was a witness in the present proceeding warrants disciplinary action even if his version of the agreement with Mrs. Monast concerning the rings is accepted. Authority to dispose of them, conceding it to exist, does not justify perjury committed in an explanation of the manner of exercising that authority.

It is, therefore, ordered that the petitioner be disbarred from the practice of the law in California and that his name be stricken from the roll of attorneys, this order to become effective thirty days after it is filed.

CARTER, J., Dissenting.—I dissent. In ordering the disbarment of petitioner, the majority of this court has violated at least two well settled rules in proceedings of this character, namely: (1) "That all intendments should be in favor of the accused attorney." (*Hildebrand* v. *State Bar*, 18 Cal. (2d) 816 [117 P. (2d) 860]; *Golden* v. *State Bar*, 213 Cal. 237 [2 P. (2d) 325]; *Aydelotte* v. *State Bar*, 209 Cal. 737 [290 Pac. 41]; *Furman* v. *State Bar*, 12 Cal. (2d) 212 [83 P. (2d) 12].) And, (2) that the findings of the local administrative committee on issues of fact are of greater weight than those of the Board of Governors. (*Werner* v. *State Bar*, 13 Cal. (2d) 666 [91 P. (2d) 881].)

This is the third opinion of this court in this case; two rehearings having already been granted. The first opinion ordered a six month's suspension of petitioner's license to practice law, and the second ordered his disbarment. This situation alone indicates uncertainty on the part of at least a majority of the members of this court of the correctness of the conclusions reached on the prior hearings. Yet, notwithstanding such uncertainty, and the elaborate and positive findings and opinion of the local administrative committee to the contrary, a majority of this court has again ordered petitioner's disbarment. I am firmly convinced that such result is not justified by the record in this case.

The local administrative committee after extended hearings made comprehensive findings, and determined that a private reproval was appropriate discipline. Those findings present the factual picture of the controversy; the committee was convinced of the unreliability of the testimony of Mrs. Monast which formed the chief basis of the Board's action. The committee found that on May 18, 1937, petitioner and another lawyer were employed by Mrs. Monast in their capacity as attorneys at law, she being then held in the Los Angeles County Jail on a charge of a violation of the State Narcotic Act. She agreed to pay them a fee of $2,000, and as security therefor delivered three diamond rings to them. They were also to obtain a bail bond for her release. Two of the rings were left with petitioner and the third with his associate. Petitioner signed a receipt for the rings reciting that they were deposited as security for attorney's fees "and bond." The latter words had been crossed out without petitioner's knowledge. He obtained a bond and Mrs. Monast was released. She paid the premium on the bond and the attorney's fee of $2,000 in three installments, the last being on May 26, 1937; petitioner's asso-

ciate returned the third ring to her when these payments were made. Petitioner did not then return the two rings held by him. Her bond was declared forfeited on July 19, 1937, when she failed to appear for trial but due to petitioner's efforts was exonerated. She was later tried and convicted, granted probation and she left for Hawaii.

On July 17, 1937, Irene Davidson and Catherine Wall were arrested and imprisoned in Los Angeles on charges of grand theft. Shortly thereafter Mrs. Monast, through her agent, requested petitioner to represent them and authorized him to hold the rings as security for his fee for such service and for the procurement of bail bonds for their release. He obtained the bonds for their release, but the amount of bail was later increased, and they were remanded to custody.

On July 20, 1937, the day after Mrs. Monast was to appear for trial petitioner pawned the two rings for $350. About two months later, and while Mrs. Monast was in Hawaii, he sold the pawn ticket for $200, and the purchaser subsequently redeemed the rings. Thereafter Mrs. Monast brought action against him to replevy the rings. He repurchased them and returned them to her after this disciplinary proceeding had been commenced.

The charges against petitioner are that he improperly disposed of the rings, that he filed a false and improper cross-complaint in the replevin action, and that he gave false testimony in a deposition taken in connection with that action. The local committee found in his favor on all charges except with respect to the cross-complaint which it found he had carelessly verified without reading it. The Board of Governors of The State Bar found against petitioner although there was no testimony taken before them which substantiated the charges. The only person with any knowledge of the transactions who appeared before them was petitioner.

Keeping in mind the conclusion of the local committee that the testimony of Mrs. Monast was not worthy of credit, it appears that petitioner testified that Mrs. Monast had advised him that he could do as he wished with the rings in connection with his fee and the bonds for Wall and Davidson. The local committee found: "Prior to said sale (of the pawn ticket for the rings) the respondent (petitioner herein) had been told by Marie Monast that he could use the jewelry to take care of the obligations to him. It is not true that Marie Monast demanded the return of the rings before she left for Honolulu

pursuant to her probation. It is not true that on the occasion of any such demand respondent represented to her that he would forward the rings to Marie Monast as soon as she had arrived in Honolulu and he, respondent, could assure her bondsmen that she had complied with the terms of her probation. It is not true that respondent was not authorized to hold the rings for any purpose other than as security for fees, but, as previously stated in these findings, respondent was authorized in the first instance to hold the jewelry as security for the balance of the fee to him from Marie Monast and as security for the bond of Marie Monast. Subsequently respondent was authorized by Marie Monast to hold said rings as security for fees due him for representing two women acquaintances of Marie Monast's—Catherine Wall and Irene Davidson.'' With reference to the charge of embezzlement of the rings the pivotal point in the case is whether the pledge thereof originally made to pay the fee for representing Mrs. Monast was changed from that relation to one in which petitioner had authority to dispose of them. The evidence which the local committee believed, shows that there was such a change. Petitioner testified that he represented Wall and Davidson upon the representation of a man named Evans ''that he had talked to Mrs. Monast and that she was willing to take care of their case and for me to come and get them out (of jail).'' Later, he said, he talked to Mrs. Monast and told her Tom Evans had called him in connection with the case of those women. ''And did she indicate,'' he was asked, ''in any wise whatsoever that she was not going to be responsible for their bond and attorneys fees?'' ''No,'' was his reply. ''If she had, I wouldn't have gone ahead with them.'' According to his testimony, he told Mrs. Monast ''in the beginning'' that his fee would be $250 for each woman and that he was going to keep the jewelry. But he also related a conversation he had with Mrs. Monast at the county jail when ''she apparently was highly dissatisfied and said that these two girls were dissatisfied the way the preliminary hearing had been handled; said they were going to get other counsel and that she didn't intend to pay for their fee or bond.''

In addition to the above testimony by petitioner, the following also appears: ''Q. . . . that you made the following statement, quoting, 'I was seeing her (Mrs. Monast) off and on from day to day, and I don't know whether it was in the hospital or in the office, and she told me that she had spent all the money she had getting herself out of trouble, and she had

to pay her way back. She expected to be released on condition that she go to Honolulu. She told me to take those' . . . the rings, I take it . . . 'that if she couldn't pay them, to *use them as I saw fit to take care of the bond and my fee.'* Is that a correct statement that Mrs. Monast told you that *if she didn't pay you for the girls' (Davidson and Wall) bond and fee, that you could use them as you saw fit?* A. That is the substance of it, yes.

"Q. By what right, Mr. Davis, did you think you could sell that jewelry. A. That I had a right to sell it, it was mine; that *was the understanding* in the original agreement. Q. By that you mean what? That she had agreed with you or told you that if she didn't pay *for these girls, (Davidson and Wall) the fee and bond, that you could dispose of the jewelry?* A. That was my understanding; yes." (Emphasis added.) That evidence clearly shows that petitioner honestly believed the arrangement to be that he was free to dispose of the rings. The circumstance that after he was given such authority by Mrs. Monast she attempted to change her mind in regard to being responsible for the representation of Davidson and Wall, is obviously of no force because it was merely an attempt to repudiate a previous agreement.

Mrs. Monast had given petitioner *carte blanche* authority to dispose of the jewelry as he saw fit. He therefore was justified in pawning or selling it, and even if it were only a pledge, the authority granted to him was sufficiently comprehensive to constitute a waiver of any notice of the sale of the pledged property. There is therefore no basis for the conclusion that petitioner was guilty of embezzlement. There is no creditable showing of any fraudulent intent on petitioner's part; nor of fraud or bad faith. Even if it be conceded that he was guilty of a technical conversion, that is not sufficient. It is said in *In re Marvin*, 180 App. Div. 778 [168 N. Y. Supp. 555, 563]:

"That is not very material here on an inquiry based upon the allegation that Marvin has acted dishonestly and in bad faith and defrauded his clients. Those questions are to be settled by *considering the acts done by him and the intent with which they were done*. They do not rest upon the technical question whether or not an equitable or a legal action is the proper remedy in a certain case, *or whether certain acts may or may not constitute a technical conversion of money without regard to intent*. Marvin can be convicted here only for an intentional fraud, an intentional and wicked violation of his

professional duties, and in determining that question we must consider his acts and motives with reference to the situation as it existed and the injury his clients are suffering from his wrongful acts.'' (Emphasis added.)

In *Barbee* v. *State Bar,* 213 Cal. 296, 299 [2 P. (2d) 353], this court said:

''But in this case also the record does not satisfactorily establish an intent to defraud. Petitioner was, we believe, stubbornly but honestly mistaken in his understanding of his rights in the matter. We are not prepared to hold that such a dispute over the fixing of a fee is ground for the drastic punishment inflicted by the order herein.'' It is stated in *In re Irwin,* 162 Ore. 221 [91 P. (2d) 518, 524]:

''The defendant argues that a technical conversion alone does not afford a sufficient basis for disciplinary action against him and that it is essential that fraud or dishonesty must have accompanied the conversion. With that we agree.'' (See, also, 7 C. J. S., Attorney and Client, § 23.)

Petitioner's answer and cross-complaint filed in Mrs. Monast's replevin action, claimed attorney's fees. Although that answer and cross-complaint was verified by petitioner it does not appear that he was aware of the allegations of the cross-complaint inasmuch as that instrument was prepared by his counsel who misunderstood the facts of the case and incorrectly pleaded them. On that subject the local committee found that: ''The allegations of said cross-complaint were due to the error of an associate of respondent's in preparing said cross-complaint and through the careless conduct of respondent in signing a verification in blank which was filled in and filed in connection with said cross-complaint. Respondent, on the face of said pleading, verified its contents. Such conduct on the part of respondent in signing a verification in blank is to be severely condemned and has been by our courts declared, and is by this committee declared, to be reprehensible. However, this committee does not find that thereby respondent intentionally swore falsely.'' The record bears out that finding. There is no satisfactory evidence that he wilfully swore to false allegations.

The perjury charge turns chiefly upon testimony with reference to petitioner's reason for not returning the jewelry to Mrs. Monast. There were other instances charged but the local committee found that the testimony was true. It appears that petitioner testified by deposition in the replevin action that

he had delivered the rings to the bail bond company as security for its bail bond issued for the release of Mrs. Monast. It is claimed that his testimony in this regard is false, being contrary to the evidence developed at the hearing before the local committee. But that committee had the opportunity to observe the witnesses, and was convinced that if there was any variance in his testimony it was inadvertent and did not constitute wilfull false swearing. They were in the most favorable position to arrive at a proper conclusion. In their written opinion filed in addition to their findings they stated: ''The charges of false swearing on the giving of several depositions in the main are based on the assumption that the story told by Marie Monast is true and that of respondent false. We have found it the other way, and accepting respondent's story, as we do, for the reasons hereinbefore set forth, such charges of false swearing fall. Respondent was not as precise and accurate in his testimony on the depositions as many witnesses might have been expected to be, but judging by his testimony before us it is evident that the respondent is slow in thinking and does not have a ready command of language to meet and describe situations which occurred in the past. His testimony as given in such depositions, when they are considered together, was substantially as given before the committee. In those depositions, as before us, he claimed he was 'within his rights' in turning the jewelry to Irving Glasser.''

The Board of Governors found that Mrs. Monast did not agree to pay petitioner the fee for representing Davidson and Wall, or the expense of procuring bail bonds; that she did not authorize him to dispose of the rings; that petitioner wrongfully pawned the rings and later sold the pawn ticket; that petitioner falsely alleged in his cross-complaint in the replevin action that Mrs. Monast was indebted to him for $1,000 for attorney's fees; that he gave false testimony in the deposition taken in the replevin action in particulars relating to the pawning of the rings with the bonding company, and his employment to represent Davidson and Wall. Those findings are dependent for the most part on the testimony of Mrs. Monast which the local committee refused to accept as creditable. There are findings of minor instances of falsity in petitioner's testimony which was not dependent on Mrs. Monast's testimony but most of them involve matters of conclusions rather than questions of fact.

The square conflict between the findings of the local committee and those of the Board of Governors clearly shows that

there was a grave doubt as to petitioner's guilt. Two examining groups came to opposite conclusions on the same evidence. The matter turned upon the credibility of witnesses. The Board of Governors had nothing but the record before it, while the local committee actually conducted the hearings. What was said by this court in *Werner* v. *State Bar*, 13 Cal. (2d) 666, 676 [91 P. (2d) 881], is pertinent:

"To pass upon the weight to be given the testimony of any witness when only the written record is before a reviewing body is always a most difficult undertaking. In this connection we think it proper to refer to the findings of the local administrative committee, not that its findings are binding upon us but simply to aid the court in determining the weight of the evidence upon which we are called to act. . . . This committee personally contacted the witnesses at the hearing. They observed their conduct and demeanor while testifying, and the character of their testimony, and no doubt took into consideration the interest of the petitioner in the result of said hearing. . . . The members of the committee were in far better position to pass upon the truthfulness of petitioner's testimony than were either the members of the Board of Bar Governors, or are the members of this court."

The local administrative committee in this case consisted of three of the ablest and most outstanding members of the Los Angeles bar. That they gave more careful and thorough consideration to this case than is given to the ordinary disciplinary proceeding is manifest from an examination of the record in this case and the carefully prepared findings and opinion in which the members of said committee unanimously concurred. In my opinion, it is impossible for any fair-minded individual to review the proceedings in this case and not entertain a reasonable doubt as to the guilt of the petitioner of any of the charges contained in the notice to show cause, which is the basis of this proceeding.

A review of the proceedings in this case before the Board of Governors discloses that petitioner was asked a few questions by some of the members of the board. The transcript of his testimony at the hearing before the Board of Governors consists of only six pages and no fact was developed by such examination to justify a different conclusion than that reached by the local administrative committee. In fact, petitioner's testimony before the Board of Governors was substantially the same as that which he gave before the local administrative committee.

However, the Board of Governors made findings directly contrary to those made by the local administrative committee and found against petitioner in almost every instance where his testimony was contrary to that of Mrs. Monast.

At the conclusion of the hearing before the Board of Governors, twelve members of said board voted in favor of disbarring petitioner, one voted against disbarment and one declined to vote.

I think I am justified in assuming that the record of the proceedings in this case before the local administrative committee was not read by all of the members of the Board of Governors, and I think it is obvious that even if the record had been read by each member of the board, he would still not be in as favorable a position to pass upon the credibility of the witnesses as the members of the local administrative committee who heard these witnesses testify. (See *Werner* v. *State Bar, supra.*)

From the foregoing, I am forced to conclude that to sustain the findings and recommendation of the Board of Governors in this case is not only denying to petitioner any intendments which may arise in his favor from the record in this case, but is resolving all of such intendments against him which is contrary to the settled rule of this court in cases of this character.

While I would be disposed to join with a majority of this court in an order imposing some discipline on petitioner for his conduct in connection with the entire transaction involved in this proceeding, I am firmly convinced that disbarment is altogether too severe and is wholly unjustified by the record before us. It is regrettable that results of this character occur, especially when they can only be accomplished by disregarding rules which this court has announced in many of its prior decisions, but such appears to be the will of the majority of this court in this case.

Petitioner's application for a rehearing was denied May 28, 1942. Carter, J., voted for a rehearing.