Argued May 23; defendant suspended June 20, 1939

# In re IRWIN

(91 P (2d) 518)

In Banc.

*U. S. Balentine* and *Clarence A. Humble,* both of Klamath Falls, for John Irwin.

*William M. McAllister,* of Medford, for Oregon State Bar.

ROSSMAN, J. This matter is before us upon the recommendation of the Board of Governors of the Oregon State Bar (1935 Session Laws, ch. 28, § 1) that John Irwin of Klamath Falls, who was licensed in 1908 to practice law, be suspended from that privilege for a period of one year. The recommendation was in exercise of the power conferred upon the board by § 13 of the above act, and was preceded by findings of fact and conclusions of law entered by a trial committee composed of Mr. H. H. DeArmond of Bend (member of the board of governors), Mr. E. O. Stadter of Bend, and Mr. Herbert P. Welch of Lakeview. Chapter 306 of 1937 Session Laws authorizes the appointment of such trial committees. The findings of fact found that after the accused had undertaken to prepare, file and foreclose a labor lien in the sum of $12.60 for one H. H. Kreigh, he later collected the debt in full and then not only failed to account for the transaction but also converted the collected sum to his own use. The findings of fact and conclusions of law ended with a recommendation to the Board of Governors that the defendant be suspended from the practice of law for one year. The proceedings just mentioned were preceded by a complaint, answer and reply.

In August, 1923, Kreigh and 10 other workmen, who had been engaged in the construction of a bridge forming a part of the right of way of the Oregon-California & Eastern Railway, employed the law firm of O'Neill and Irwin to prepare, file and foreclose the necessary labor lien claims for some wages owing them which their employer had neglected to pay. The law firm was composed of Charles M. O'Neill and the defendant. O'Neill died in March, 1936. Kreigh's claim was for $12.65. Each of the 11 workmen paid O'Neill and Irwin $5 for the preparation of his lien claim. The total of the claims was $2,873.61. Irwin participated in the above conference with the men in August, 1923, and subsequently assumed charge of the work required by the engagement. August 15, 1923, the lien claims were filed and shortly thereafter all of the claimants, with the exception of one L. D. Patterson, assigned their rights to the latter in order to facilitate enforcement of the claims. Next, the attorneys instituted a suit in the circuit court for Klamath county to obtain judgment upon the claims, establish the liens and foreclose the latter. The complaint in that suit averred that $12.65 was due to the aforementioned Kreigh for his labor, and prayed for judgment in that amount, together with the sum of $10, the alleged cost of preparation of the lien notice and for the further sum of $50 attorney's fees. After an answer and a reply had been filed a trial took place in the circuit court, and on October 23, 1925, a decree was entered in compliance with the prayer; that is, it awarded to Patterson judgment for $2,873.61, $825 attorney's fees, and $110 for preparation of the lien notices. It also allowed costs and disbursements of $237.40. The sums awarded upon the Kreigh claim were $12.65, $10 preparation fee, and $50 attorney's

fee. Later, the railroad company appealed and on June 29, 1926, this court, apart from reductions totaling $179.45 which do not pertain to the Kreigh claim, affirmed the decree of the circuit court: See *George v. Oregon etc. Ry. Co.*, 118 Or. 502, 247 P. 780. Costs and disbursements incidental to the appeal were allowed in the amount of $125. August 2, 1926, after the entry of a decree upon the court's mandate, the railroad company paid to O'Neill and Irwin the amount of the judgment, that is, $3,629.61, together with $644.93 interest (6 per cent since August 15, 1923), $237.40 circuit court costs, and $125 supreme court costs.

Kreigh resided in Redding, California, 160 miles south of Klamath Falls. After he had visited the offices of the law firm in 1923 for the purposes already indicated, he did not return until May 3, 1937. At that time he demanded payment of his claim. September 27, 1937, when he had received nothing upon his claim, the present proceeding to revoke the license of Irwin was instituted. Irwin admits that, in the meantime, he had paid nothing upon the Kreigh claim to Kreigh, Patterson or anyone else.

The above circumstances are free from dispute. We shall now mention others upon which the parties are not in full accord.

Kreigh claims that the attorneys agreed to perform the necessary services for the enforcement of the claims without charging the claimants anything except the $5 fee which was paid at the time of the original visit. He swore that for further compensation the attorneys agreed to look to the debtor. Section 51-109, Oregon Code 1930, provides that "the court shall, upon entering judgment for the plaintiff, allow as a part of the

costs all moneys paid for the filing and recording of the lien, and also a reasonable amount as attorney's fees." The defendant admits that such an agreement was made, but claims that, by implication at least, it was limited to the services to be performed in the circuit court. The terms of the agreement, which were not reduced to writing, are material because the defendant claims that under its provisions he was justified in subsequently keeping the entire sum of $12.65 as compensation for his services before this court. In fact, he says that after the circuit court decision had been affirmed he charged Kreigh $50 in addition to all other sums allowed by the court, thus making Kreigh his debtor in the amount of $37.35.

Kreigh swore that in August, 1923, when he called upon O'Neill and Irwin fees were discussed and that it was agreed "that $5 was all we were supposed to pay." He was asked, "How did you know that?" and replied, "That is what they told us." Next, he was asked, "How were they going to be paid?" and replied, "I guess they figured on getting a judgment from the railroad," and added, "That was the understanding." Next, he was asked whether he remembered "the exact words of their conversation," and replied, "I don't remember the exact words, no, it has been so long ago; but I do know our understanding with them was we were to pay $5 a lien and that was the end of our obligation. They were supposed to get their money out of the case." He stated that the agreement did not contemplate the return of the $5 sum paid for the preparation and filing of the lien claim. Upon cross-examination, defendant's counsel asked the witness whether

he paid Irwin any compensation for services upon the appeal, and received the following answer: "I was never notified of anything like that; I didn't know there was anything. My understanding with him was that the $5 lien was the end of my obligation with him." The defendant admits that he never notified the plaintiff of the outcome of the cause in the circuit court nor of the fact that an appeal had been taken. He had Kreigh's address. He swore that he told some of the other claimants that an appeal had been taken, and that each of them refused to provide any money for the incidental expenses.

Concerning the agreement for the fee, Irwin testified: "Prior to and at the time of making up these several liens, at that time we had no conception at all— had no idea there would be such a thing as appeal to the supreme court. Our agreement with the different lien claimants was that we would put in whatever we thought was reasonable, in the trial court, as attorney's fees and take our chances in the trial court of their being allowed—such attorney's fees as we asked. Nothing was said, no agreement was made, even contingent; in fact, we never thought anything of that kind because we thought they would be settled—to go to the supreme court." When requested to repeat what was said in August, 1923, concerning the attorney's fee, he replied: "Yes, there was talk about attorney's fees in the trial court. Whatever, of course, we claimed and got in the trial court, that would be our attorney's fees in the trial court." Shortly he added, "We had no idea of appeal because we thought it would be settled up." He was then asked, and answered, as follows:

"Q. You don't mean to give the impression to the trial committee that you specifically limited your agree-

ment to fees in the trial court? A. That was all that was said about it; the fees were limited to the trial court, absolutely.

"Q. Well, you told these men you put in your claim for attorney's fees and filed the suit and collected the amount of their liens? A. Yes, that was in the trial court. We never make arrangement for the supreme court until we start there.

"Q. You did not say to these men, 'these fees we are going to get are going to be for our services in the trial court, and if the case is appealed you are going to have to pay us additional'? A. No, I did not say a word about it because we did not figure the supreme court. We wished to make those things clear because clients frequently come along afterwards and say, 'you did not tell us about this.'

"Q. And you were to get your attorney's fees from the defendant? A. Well, whatever was allowed in the trial court on the foreclosure of the liens."

We mentioned the fact that the accused concedes that Kreigh was not notified of the outcome in the circuit court nor of the fact that an appeal had been taken. He likewise concedes that he did not ask Kreigh to pay anything towards defraying the expenses upon appeal nor even ask for authority to represent him in this court. He testified that after the affirmance he notified Kreigh of that fact, but Kreigh denied positively that he received any notification. After the circuit court's decree had been affirmed and the law firm had collected the judgment, then, according to Irwin, the two partners discussed the amount of the charge which they should make for their services subsequent to the notice of appeal. According to Irwin, they concluded that they would charge each claimant one-half of the amount of his claim, the minimum charge, however, to be $50. The

following appears to be an indication of the manner in which they carried their charges into effect:

| Lien Claimant | Principal | Charge | Fee Allowed | Preparation Fee |
|---|---|---|---|---|
| L. D. Patterson | $ 312.90 | $ 156.45 | $100.00 | $ 10.00 |
| Sam Larson | 92.95 | 46.48 | 50.00 | 10.00 |
| G. O. Elliott | 13.60 | 13.60 | 50.00 | 10.00 |
| H. H. Kreigh | 12.60 | 12.60 | 50.00 | 10.00 |
| Bidwell Riddle | 84.50 | 42.00 | 50.00 | 10.00 |
| P. H. Preuitt | 431.25 | 215.63 | 100.00 | 10.00 |
| Roy Vernon | 136.65 | 68.32 | 50.00 | 10.00 |
| Pat Gleason | 462.47 | 231.23 | 100.00 | 10.00 |
| Ole Forsell | 268.36 | 134.18 | 75.00 | 10.00 |
| E. MacDonough | 744.53 | 372.26 | 150.00 | 10.00 |
| H. S. Smith | 135.25 | 67.62 | 50.00 | 10.00 |
| Total | $2,694.56 | $1,360.37 | $825.00 | $110.00 |

Thus, the attorneys' charge of $1,360.37 was more than one-half of the amount of the claims as nothing whatever was paid to Elliott or Kreigh. Besides charging $1,360.37 the attorneys took the following sums:

Attorney's fees allowed in the circuit court ....$ 825.00

Cost of preparing and filing liens allowed in the circuit court ................................................. 110.00

Cost of preparing and filing liens paid by clients ................................................................. 55.00

Interest on principal of judgment ......................... 644.93

Total ............................................................$1,634.93

In addition to these sums the attorneys also kept the costs and disbursements awarded in the circuit and the supreme courts amounting to $362.40. From the half remitted to some of the claimants the firm deducted $4.77. Irwin explained that this represented each client's contribution to the transportation and

hotel expenses which he incurred upon his trip to Salem to argue the case before this court. Thus, out of the proceeds of this litigation the law firm took at least $3,357.70 while the litigants received $1,334.17.

It will be observed that the attorneys took all the interest money. Irwin explained, "We took it as fees, yes, sir." He expressed a conviction that, since he bore all of the expenses of the appeal, the above charges were just. These expenses were not very large; they consisted of a fee of $10 paid for an appearance in this court and the expense of printing a supplemental abstract of record of 30 pages and a respondents' brief of 50 pages. Costs at the rate of $1.25 per page were allowed for these two documents. But these two documents also served as the supplemental abstract and respondents' brief in the companion case of *George v. Oregon etc., Ry. Co.*, 118 Or. 502, 247 P. 780, in which the respondents were represented by another law firm; and hence it may be that Irwin did not alone bear all of the expenses just mentioned.

Among the papers which constituted Irwin's office file concerning this case is one bearing the following entries in handwriting:

| Amount of Liens | |
|---|---|
| $ 312.90 | L. D. Patterson |
| 92.95 | Sam Larson |
| 12.60 | Harold Kreigh |
| 13.60 | G. O. Elliott |
| 84.00 | Bidwell Riddle |
| 431.25 | P. H. Preuitt |
| 136.65 | Roy Vernon |
| 462.47 | Pat Gleason |
| 268.36 | Ole Forsell |
| 744.53 | E. MacDonough |
| 000.00 | H. S. Smith |

```
 135.25 H. S. Smith
 ½) $2,694.56 Amount of liens

 $1,347.28 ½ of liens
 $4,636.18 Amount of judgment
less 2,694.56

 $1,941.62
 1,347.28

 ½) $3,288.90

 $1,644.45 To each.
```

Thus, each of the two partners in the law firm took more than they paid to all 11 claimants. But it will also be observed that the method of charge above employed contemplated that Kreigh and Elliott should receive at least one-half of their claims, thus contradicting the defendant's testimony that all claims of $50 or less should be taken in their entirety as fees. As a matter of fact, neither received anything.

Kreigh swore that after he had placed his claim in the attorneys' charge he returned to Redding and that thereafter he wrote the attorneys once every six months for a period of four years, asking for information concerning the outcome of his claim. He said that in the first two and one-half years he received an occasional answer stating that the matter was pending in the courts. The defendant denied that the firm received any letters from Kreigh, and likewise denied that they sent him any communications except one after the firm had received payment of the judgment and was prepared to make distribution. He produced no copy of the letter and Kreigh denied its receipt. Irwin

claimed that about two years before the hearing with which we are now concerned he destroyed his file, but we observe that he produced at least a partial file concerning these claims.

According to Kreigh, he did not return to Klamath Falls until May 3, 1937. He then remained for two days and had three interviews with Irwin. Shortly before coming an acquaintance had told him of the outcome of the suit. As witnesses, Kreigh and Irwin related at length what was said in these conferences of May, 1937. It is clear that Kreigh at that time asked for an accounting and for payment. He received neither. He swore that when he entered Irwin's office he stated his name, the name of his employer at the time the claim was filed, and other identifying facts, and then asked why payment had not been forthcoming. When Irwin disclaimed all knowledge of the matter, Kreigh tried further to identify the claim and even wrote his name upon a piece of paper so that Irwin could have that much aid in searching through his files. The first interview then ended. Apparently Kreigh believed that he needed more information in order to revive Irwin's recollection, and, accordingly, called upon an acquaintance who gave him the name of Mr. R. C. Groesbeck, the attorney who had represented the railroad company in the litigation. Mr. Groesbeck supplied Kreigh with information concerning the decree, the amount allowed upon his claim, the attorney's fees awarded and other items. Kreigh next consulted the files of the county clerk and from there went to the office of the district attorney who informed him that if he had in mind a charge against Irwin for embezzlement the offense was barred by the period of limitations. The district attorney sent Kreigh to Mr. D. E.

Van Vactor, president of the Klamath County Bar Association. The next morning Kreigh returned to Irwin and told him of the information that he had acquired about the amount recovered upon his claim. According to his testimony, Irwin replied, "Now, you have found that out, what are you going to do?" and then abruptly ended the interview. In the next conference the results were equally unsatisfactory and, finally, Kreigh told Irwin that he would place the matter before the State Bar association. He swore positively that he never asked for payment of more than $12.60 after he had found that that was the amount awarded in the judgment. He did not even ask for the return of the original payment of $5 although he had discovered that the court had allowed $10 for that purpose and that Irwin had collected it.

The defendant swore that when Kreigh entered his office upon the first occasion he came "in a very belligerent manner," and referred to the claim under an erroneous title, thereby failing to identify it in the attorney's mind. He said, however, that Kreigh stated, "I am Harold Kreigh. * * * I am one of those claimants," adding that he lived in Redding, California, and was one of the employees of the Nettleton-Bruce-Eschbach Company at the time the work was done. The latter name had assumed a prominent place in the course of the litigation. Irwin swore that during the course of the interview "hot words" were exchanged, but that towards its close the matter had become identified in his mind. He admitted that before Kreigh left he (Irwin) told him, "I don't owe you a cent." He stated that after Kreigh had made his visits to the courthouse and to the offices of Groesbeck and Van Vactor he returned to his (Irwin's) office the next

morning. According to the defendant, Kreigh entered in a friendly manner and "our relations were friendly" at the beginning of this conference. Kreigh, so the defendant said, demanded $72 and, when this was refused, left. According to Irwin, Kreigh returned a third time. We now quote from his testimony: "He came in my office in the morning and said, 'Mr. Irwin, I want to apologize to you for the way I talked to you yesterday.'" This was followed, according to Irwin, by a statement that he (Kreigh) had mistakenly asked for payment of $72, and then "he said, after he said he wanted to apologize to me, and he didn't know where he had made the mistake—he said, 'if you want to settle with me for $5.50' or $5 or whatever the exact amount was, 'I'll settle with you.' I hadn't learned yet who he was. I said, 'I don't owe you anything.' Then he talked around a while. I said, 'We are not getting anywhere in this matter.' He had mentioned Mr. Groesbeck to me as his attorney and he had mentioned Van Vactor as his attorney. I said, 'Now, you mention these two men. You and I aren't getting anywhere. You send these men to me and we'll talk this thing over, but far as my talking to you any more, I'll not talk to you.'" Thereupon the interview terminated.

Although remittance was made to Larson on August 20, 1926, to Patterson on September 13, 1926, and to MacDonough on October 1, 1926, no payment was made to the other claimants until about a year after O'Neill and Irwin had received payment of the judgment. It will be recalled that payment was made to them August 2, 1926. Seven witnesses, all members of the bar who had known Irwin over an extended period of time, swore that he bore a good reputation for integrity. An eighth witness, who had served for many years as a

clerk of the circuit court in Klamath county, and who had known Irwin since 1910, gave similar testimony. The above, we believe, is a fair resume of the evidence.

We return to the question: What was the agreement between the law firm and Kreigh concerning payment for the legal services. It will be recalled that Kreigh testified positively that he was assured that nothing more would be expected of him than the $5 which he paid for the preparation and filing of his lien claim. He swore that the attorneys informed him that for their services they would secure payment from the employer. It will also be recalled that Irwin did not expressly contradict this testimony, but mentioned a mental reservation which he failed, however, to disclose to his clients. Without telling the claimants about it he claimed that in his calculations only the services to be performed in the circuit court were considered by him. He swore that because the railway company had made settlement of similar claims without taking an appeal, the possibility of an appeal had not entered his mind. It is significant that when an appeal was taken no mention of it was made to Kreigh, although his address was on file in the attorneys' office. If at that time the attorneys had expected to make a charge against Kreigh for their services upon appeal, it seems certain that they would have mentioned the subject to the client. From an annotation in 2 A. L. R. 845, which concerns the allowance of additional compensation to attorneys who have entered into express agreements for the payment of their services, we quote:

"An attorney ought not to do work he considers beyond the contract, with the intent of charging his client therefor, without consulting his client and enlarging the contract. Moses v. Bagley (1875), 55 Ga. 283; Reynolds v. Sorosis Fruit Co. (1901), 133 Cal. 625,

66 Pac. 21; Gabrielson v. Gorin (1916), 92 Wash. 408, 159 Pac. 387.''

We concur in that view and believe that the bar of this state follows the practice mentioned in the quoted language. The attorneys in this suit expected to keep from the proceeds of the judgment the sum of $60 for themselves and give to their client only $12.60. It now appears that they expected not only the $60 but also interest upon Kreigh's part, and to retain whatever costs and disbursements were apportionable to this part of the judgment. Hence, their interest in the judgment was about five times as large as that of their client. Motives of self-interest, therefore, must have prompted them in their efforts to sustain the judgment in this court. This being true, we feel especially certain that if the defendant had expected to make a charge against Kreigh for his services in this court he should have communicated his intention to his client.

Since an attorney possesses superior knowledge of the work which the retainer is likely to involve, courts expect him to designate clearly the services covered by the retainer when he accepts the employment. Therefore, when he later claims that he ought to be compensated for work which he did as an extra item not included within the retainer, ambiguities and doubts concerning the agreement are resolved against him. We quote from 7 C. J. S., Attorney and Client, § 182, at p. 1058:

''Consistently with the general rules of construction, however, the courts are unwilling to find that services were not included in the contract, and in doubtful cases will usually decide the point against the attorney, particularly where the client did not request

the services or understand that they were outside the contract.''

From 5 Am. Jur., Attorneys at Law, § 159, p. 356, we quote:

''A doubtful or ambiguous contract for professional services and for the compensation of an attorney who drew it should be construed in favor of the client.''

■ We are convinced that since Kreigh could not have been expected to know that an appeal to this court was possible upon a claim amounting to only $12.65, Irwin should have told him of such a possibility and of his expectation to make an additional charge, if he contemplated the making of one, for services in the event of an appeal.

■ Again, some retainers for services to be performed in the course of litigation are of such a nature that they include representation upon appeal. The authorities are digested in an annotation in 2 A. L. R., p. 849, under the subtitle Appeals. It is our belief that the statute previously cited, under which the attorney's fee was allowed, contemplates that generally the award will suffice in the event of an appeal. The purpose of the statute is to relieve the workman of attorney's fees and exact them from the delinquent employer. In the suit in which the attorney's fee was awarded it was apparently assumed that the fee sufficed for the services in both courts, for this court, in its decision (118 Or. 502, 509, 247 P. 780, 782) stated:

''Appellant complains of the amount of attorneys' fees allowed the various lien claimants, but, in view of the protracted litigation in which these claims have been involved here and in the lower court, we are not inclined to disturb the findings of the trial court in that respect.''

It will be observed that the phrase "here and in the lower court" was used. Continuing, the decision stated:

"Our attention is directed also to the fact that $10.00 was allowed some of the claimants for 'preparing, verifying and filing' notice of lien * * *. We are unable to ascertain from the record what part of this sum was paid for filing and recording."

The amount awarded, that is, $10 for each of the 11 claimants, was affirmed, although the claimants had paid only $5 for that service. The attorneys kept the entire amount, although it is obvious that the award was intended to reimburse the client for the expenditure he had incurred.

From the above we see that the approved practice required Irwin to notify Kreigh of his intention to deem the appeal to this court as an extra item, not covered by the contract of employment, if he expected to charge for it; but he gave no notice. Next, if any doubt exists in our minds whether the employment required Irwin to sustain the judgment in this court without exacting additional compensation, it is our duty to resolve that doubt against the attorney in the absence of sufficient reasons to the contrary. We know of no reason for resolving the doubt in the defendant's favor. Finally, since the statute under which the fee was awarded contemplated that it should relieve the workman of the expenses of the attorneys' services, and since the decision of this court which Irwin obtained assumed that the fee covered all services, we have an instance in which the terms of the employment precluded the exaction of additional compensation. We are clearly satisfied from this analysis that the contract which the attorneys and Kreigh effected in August,

1923, contemplated that the attorneys should receive only $5 from their client, and that it did not authorize the attorneys to keep any part of the $12.65. That being true, the accused converted to his own use the $12.65 when he failed to account and to remit.

■■ The defendant argues that a technical conversion alone does not afford a sufficient basis for disciplinary action against him and that it is essential that fraud or dishonesty must have accompanied the conversion. With that we agree. There is nothing in the record which indicates that Irwin conferred with any of his clients before determining the amount of the charges which he made. The contrary quite clearly appears. It does not appear that he notified any of his clients that any interest had been awarded nor that the judgment included a reimbursement to the clients for the sum that they had paid for the preparation and filing of their lien claims. His action in retaining all of the interest money and the sum of $110 awarded for the preparation of the lien claims certainly was unlawful, and therefore unjustified. It was an appropriation to himself of money belonging to clients who had trusted him and who, like Kreigh, lived in distant places and had no means of knowing the contents of the decree. As we have just shown, his contract did not entitle him to convert to his own use the sum of $12.65 covering Kreigh's wages. When he assumed possession of that sum he held it as trustee. We are satisfied that he made no effort whatever to notify Kreigh that he possessed the money. Finally, the exaction of one-half and more of the principal of the liens for the services which O'Neill and Irwin performed in this court, even if the attorneys had been justified in making any additional charge, was unreasonable. A brief of

only 43 printed pages (one of which was the title page) was submitted. It was written in collaboration with another firm of attorneys who represented another group of lien claimants. The above facts, in our opinion, show such unconscionable action in charging workmen exorbitant fees that they denote fraud and dishonesty.

The defendant did not come before the trial committee in a repentent attitude, but there insisted that his fees were proper. When asked by members of the trial committee whether he did not feel that his exactions were unjust, he seemed to resent the inquiries. Even now no remittance has been made to Kreigh. The latter left Irwin's office on May 4 and nothing was done by the grievance committee towards filing a complaint until about four months later. Here was plenty of time for making amends. If Kreigh was belligerent upon his first call, he made two others when his attitude, according to Irwin, was ''friendly'' in the course of one and ''apologetic'' upon the other occasion. We observe that during the course of the final interview Kreigh, according to the accused, expressed a willingness to accept $5.50, stating that he needed the money because his wife was ill in a hospital. But that plea was repelled and the client was told to leave the office, being directed to send an attorney in the event he desired to press his claim any further. We cannot lend our approval to such conduct. We are certain that it is not in consonance with the practice of the bar of this state and believe that it tends to bring the entire practice of the law into disrepute. This conduct cannot be excused upon a belief that the attorney had forgotten the item nor that at the time when his client called he was momentarily irked by a belligerent at-

titude. The facts show that for a long time the attorneys kept all of the money except that which they remitted to three of their clients; and even these three remittances were made only after the men had asked for payment. In the period of delay the attorneys apparently determined, after reflection, to make these charges. Having decided upon the course, which we believe all attorneys will deem unwarranted, the accused never repented, but when brought before the trial committee expected it to lend its approval to his course.

 The defendant argues that the testimony which indicates that his fees were exhorbitant was not admissible because the complaint does not charge him with such misconduct. However, he claims the right to retain the $12.60 under a contention that he could properly keep it as a reasonable fee. Therefore, the propriety of his charge was placed in issue by himself. Our conclusions must be governed by the nature of the charge made against him in the complaint: failure to account and conversion of his client's money. The fact that the sum converted—$12.60—is small does not excuse him. See annotation in 43 A. L. R. at p. 75. But those interested will find a comprehensive collection of cases concerning exorbitant fees as a ground for disciplinary action against attorneys in the reprint of *Louis Goldstone v. State Bar of California,* (214 Cal. 490, 6 P. (2d) 513) in 80 A. L. R. 701 at page 706.

 The defendant contends that in instances of this kind the evidence must possess a high degree of cogency. That is true. But in this case the defendant's wrong is established by facts for which he himself vouches.

 It is true that this matter is somewhat stale, and, as we have already mentioned, reliable witnesses testified that the accused bore a good reputation for integ-

rity over an extended period of time; but his conduct in the transactions above described are of the very type which hamper the usefulness of all attorneys. Both the trial committee and the board of governors have recommended the suspension of the defendant's license for one year. We adopt that recommendation, but add that unless full restitution is made within 15 days after the announcement of this decision, the suspension will be permanent.

For the sake of clarity, we explain that our use of the sum $12.65 in some instances and $12.60 in others is due to the fact that the judgment awarded to Kreigh $12.65, but the complaint against Irwin expresses the amount as $12.60. Again, we stated that the costs allowed upon appeal in this court were for a brief of 50 pages and at another place stated that the brief consisted of only 43 pages. Both statements are true.

RAND, C. J., and BEAN, BAILEY, BELT and KELLY, JJ., concur.