Argued April 3, Little suspended for one year, King
publicly reprimanded September 7, 1967

In re Complaint as to the Conduct of
CARL M. LITTLE and STEPHEN M. KING,
Accused.
431 P. 2d 284

*Gunther F. Krause,* Portland, argued the cause and filed a brief for Carl M. Little, Accused.

*William M. Dale* and *Thomas H. Tongue,* Portland, argued the cause and filed briefs for Stephen M. King, Accused.

*John J. Higgins,* Portland, argued the cause for Oregon State Bar. With him on the brief was Stuart W. Gates.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, GOODWIN, LUSK and FORT,* Justices.

PER CURIAM

This is a review of the recommendation of the Board of Governors of the Oregon State Bar in a disciplinary proceeding brought against two members of the Bar, Carl M. Little and Stephen M. King.

The proceeding was commenced by a complaint served on the accused in March 1964. After a hearing before a Trial Committee, at which the prosecutors moved that the charges against King be dismissed, the Board of Governors recommended disciplinary action against Little. The proceeding was pending for review in this court when the Bar filed a motion that it be remanded to the Board of Governors for

---

* Did not participate in this decision.

the purpose of taking further testimony, and that motion was allowed and another hearing held before the Trial Committee in March 1965, during which the Bar was permitted to file an amended complaint. Following the second hearing the Board recommended, by a vote of eight to three, that Mr. Little be suspended for a period of three years and by a similar vote— three members voting for a public reprimand—that Mr. King be suspended for a period of one year.

The charges grow out of legal services rendered to one Billie Walton by the accused in establishing that he was the surviving spouse of Seda Walton, a member of the Klamath Indian Tribe. The accused had entered into a contract with Walton under which they were to be paid, in the event of litigation, a fee equal to 50 per cent of moneys received by Walton as such surviving spouse. The propriety of the contract is not challenged; the services were rendered and the fee earned and a part of it was paid without any difficulty arising. The question is whether the accused resorted to unethical means to secure payment of the balance of the fee, $11,227.42.

The amended complaint alleges that the accused entered into a conspiracy "for the common purpose and design of obtaining the payment to themselves" of their fee and that in furtherance of that conspiracy they committed the following acts: They agreed with one Verle Penney, a person having influence with Walton, to pay him part of their legal fee to use his influence with Walton to control Walton's judgment in his relations with the accused; they secured the appointment of Penney as conservator of the estate of Billie Walton, although Penney had interests in conflict with Walton's in the latter's relations with the accused; they presented a claim to the conservator of said estate and obtained his allowance thereof; they

attempted to obtain an order of the court allowing said claim; they filed a suit in the Circuit Court for Multnomah County against Walton and the conservator for a judgment for the amount of the claimed fee; they obtained payment from the conservator of the amount of the claimed fee after the court had refused to allow it and had ordered the accused not to obtain payment in that way; and, they obtained an order of the court closing the conservatorship without calling the court's attention to the fact that such payment had been made. It is alleged that, beginning with the securing of Penney's appointment as conservator, the accused purported to represent the interests of Billie Walton and of the conservator of his estate, and thereby deprived Walton of independent legal representation.

The story commences in 1958. Little and King at that time shared office space in the American Bank Building in Portland, Oregon, and employed the same secretary. They were not partners, though occasionally they would be associated in the handling of a particular piece of business.

Early in January, 1958, a client of Little's, named Verle Penney, told him that he had a friend named Billie Walton whose wife had just died leaving considerable property. Walton was in the city jail and Penney asked Little to go and see him. Little did so and subsequently, at his request, King drafted and secured Walton's signature to a contract which recited that Walton had employed Little and King to represent him in protecting his interest in the estate of his late wife, Seda Walton, then in the course of administration in the probate court for Multnomah County. The contract, dated January 28, 1958, provided that the attorneys would be paid for their services 33-1/3 per cent of the amount recovered if Walton's claim

should be settled without court appearance, and 50 per cent if court appearance should be made. Not being able to secure a settlement, the attorneys commenced a proceeding in court which resulted in a decree adjudicating Walton the surviving spouse of Seda Walton, deceased, and as such entitled to receive one-half of her estate.

In 1959, $6,349.93 was received from the administrator of the estate of Seda Walton, deceased, and divided, pursuant to the contract, 50 per cent to Walton and 50 per cent to his attorneys. Final distribution of these moneys was made in October, 1959. As a member of the Klamath Indian Tribe, Seda Walton was entitled to receive the sum of $22,454.85 from the Federal Bureau of Indian Affairs. Payment of this money was not made until April, 1961, and it is around the efforts of the attorneys—mainly of Little—to make certain that they received their fees that this case revolves. Before payment of the Indian money certain documents were executed to which attention will now be called.

Under date of April 11, 1958, apparently about the time of the decision in Walton's suit, Walton gave Penney a power of attorney, notarized by Little, very comprehensive in its provisions, and which stated that the general powers therein granted "shall specifically apply to all of my right, title and interest in and to my share of the estate of Seda Johnson Walton, my deceased wife, but subject, nevertheless, at all times to the direction and control of my attorneys, Carl M. Little and Stephen M. King of Portland, Oregon."

Under date of December 10, 1959, Walton, Little, King and Penney executed an agreement in writing by which Walton agreed to assign all his interest in the property inherited from his deceased wife to Little,

with the understanding that Little should distribute all moneys collected by him in pursuance of the agreement, as follows:

To Little, 25 per cent for legal services.

To King, 12½ per cent for legal services.

To Penney, 12½ per cent for personal services heretofore rendered and to be rendered by Penney to Walton.

To Walton, 50 per cent, less any moneys advanced to him by Little.

The agreement provided further that Little would advance to Walton not to exceed $25 per week for living expenses.

On February 18, 1960, Walton executed an instrument in writing by which he granted to Little all his interest in the inherited property, especially the tribal moneys, and appointed Little his attorney to collect the tribal moneys from the Bureau of Indian Affairs. Walton acknowledged the execution of this instrument before King as a notary public, and it was recorded in Klamath County.

The Bureau of Indian Affairs, however, declined to make payment to Little and insisted upon the appointment of a guardian or conservator for Walton. As a result, on the petition of Walton, averring that he was a tuberculosis patient and unable to manage his affairs, and that Verle Penney was "a close personal friend and confidant of your petitioner and a fit and proper person and otherwise qualified to serve," Probate Judge William L. Dickson on May 24, 1960, appointed Penney conservator of the estate of Billie Walton, "physically infirm." On March 6, 1961, the resignation of Penney as conservator was accepted by the court on the petition of Walton, and W. H. Farquharson, a certified public accountant, was appointed to succeed him, and continued to act as con-

servator until the estate was closed. Penney resigned because he had been indicted for commission of a felony. He was subsequently convicted and sentenced to the penitentiary.

At about this time Walton was convicted of burglary and was in the penitentiary when Penney arrived there.

On August 17, 1961, Little presented to the conservator a copy of a proof of claim for the attorneys' fees. This instrument was signed by King. In a letter to the conservator, enclosing a copy of the claim, Little wrote:

> "* * * If you approve the claim, I would not wish you to pay it until after Walton has first authorized the payment thereof and, also, an order of the court has been made and entered in the proceedings authorizing you to pay the same. * * *"

The claim was approved and allowed by the conservator on October 9, 1961.

On September 12, 1961, Walton, then in the penitentiary, signed and swore to a petition prepared by Little for an order of the probate court directing payment of $11,227.42 to Little and King in full for their legal services. The conservator swore to a similar petition on October 9, 1961. These petitions were not filed, but were presented by Little in October, 1961, to the probate judge, who refused to allow them, at least at that time, as Walton had written letters to him from the penitentiary objecting to the payment of the fees. Little was kept informed of these objections by Judge Dickson and he also received letters from Walton objecting to the fees. On or about November 16, 1961, Little and King caused to be served upon the conservator and Walton an attorneys' claim of lien. On May 9, 1962, they filed suit in the circuit

court for Multnomah County against Walton and the conservator to recover a judgment for the amount of their fee as stipulated in the contract of January 28, 1958. Only Walton was served. This case was eventually dismissed for want of prosecution.

On May 17, 1962, Walton, who had been recently discharged from the penitentiary, signed a document styled "RELEASE", and entitled in the suit just referred to, in which Walton stated that he had read the complaint in that suit and acknowledged that Little and King should be paid the balance of the attorneys' fee they were claiming and authorized its payment by the conservator. Walton again signed the "RELEASE" on May 23, 1962, in the presence of Farquharson and Little in the latter's office. Further, on May 23, 1962, Walton signed and swore to a petition addressed to the probate judge and filed the following day, in which he again acknowledged the justness of his attorneys' claim, authorized his conservator to pay it, and prayed that the Conservator's Second Report, which was filed at the same time, be approved, the conservatorship settled and closed, the conservator discharged, and his bondsman exonerated. In the Conservator's Second Report it is stated, among other things, that, while he had found the claim for the attorneys' fee in question just and allowed it, he had withheld payment because of Walton's objection. The report referred to the approval of the fee by Walton in his petition, but did not specifically pray for authority to pay it.

Mr. Little appeared before Probate Judge Dickson on May 23, in Chambers, and Judge Dickson informed him that he disapproved the $11,000 fee, that the reason for his disapproval was that he had reviewed the file and the work that had been done, and felt that King and Little had already been adequately

compensated. The matter was adjourned until the next day when the proceeding was in open court with Walton present, as directed by the judge. In Little's presence, Judge Dickson reminded Walton that he had not passed upon or fixed any fee, asked him whether he understood that the question of an attorney's fee was a private matter between him and the attorneys and it was up to him to settle the matter as he saw fit, and asked him whether he was capable of dealing with his attorneys at arm's length in settling any controversy regarding their fee. Upon receiving affirmative answers to these questions and being informed by Walton that he desired the conservatorship closed, the judge stated that the second report of the conservator would be approved and the conservator discharged.

On May 24 there was filed in the conservatorship proceedings a petition signed by Walton in which he stated that his tuberculosis was inactive and he was no longer in need of a conservator; that the claim of Little and King for $11,227.42 for legal services was a just claim, that he had read the second report of the conservator, and recommended that it be approved and the conservator discharged.

The court entered an order approving the second report on May 24, 1962, and on May twenty-fifth the conservator filed his Final Supplemental Report, which stated that all claims had been paid, except that of Little and King for their attorneys' fee, and two other items not now relevant. The court approved the supplemental report on May twenty-fifth, and the final paper in the record of the conservatorship is an order, dated June 11, 1962, which recites that it is made upon the motion of Little and that it appeared to the court that since the filing of the Final Supplemental Report the balance of cash on hand at that

time, $16,511.79, had been disbursed as appeared from the receipted vouchers on file, and concluded by ordering that the conservator be discharged, his bondsman exonerated, and the estate settled and closed.

Among the vouchers is a cancelled check signed by the conservator and countersigned by Little, dated June 1, 1962, to the order of King and Little in the sum of $11,245.67.[1]

It also appears that on May 25, 1962, the conservator had paid Billie Walton $3,551.25 as his distributive share of the moneys remaining in the hands of the conservator. Previous payments had been made to Walton or for his account and no question is raised in this proceeding as to the correctness of the amount of the final payment.

Judge Dickson testified that at the time Mr. Little applied to the court to obtain the closing order, payment of the fee was not called to his attention and he did not learn of it until several days later when he was told about it by one of the clerks.

The amended complaint is an unusual one. It charges the accused with conspiracy to commit an act ordinarily considered entirely proper and ethical, to wit, the collection of a fee by a lawyer for legal services rendered. In essence the complaint alleges that the accused resorted to improper means to accomplish a legitimate end. Perhaps this is what the Bar means when it says in its brief that its position is "that while on the one hand representing Walton's interests (and their own) as regards Walton's inheritance, the two accuseds also conspired against the interests of Walton so as to deprive Walton of any independence regarding their fee, and in so doing, the accuseds committed

[1] $18.25 of this amount was court costs incurred by Little and King in their suit against Walton and the conservator.

numerous overt acts." Before discussing these "overt acts" we take notice of a preliminary question.

Although the Bar has not seen fit to charge in the amended complaint that the contingent fee contract was in its terms unfair or a violation of any canon of legal ethics or that it was obtained by the use of any improper means, counsel for the Bar suggested at the hearing before the Trial Committee that this was an issue in the case and had been made so by the accused themselves. In support of this position the Bar has cited in its brief *In re Irwin,* 162 Or 221, 91 P2d 518. There a lawyer was found guilty of conversion of his client's funds as charged in the complaint. He contended that testimony showing that his fees were exorbitant was not admissible because the complaint contained no such charge. We affirmed the rule that the decision in a disciplinary case against a lawyer must be governed by the charge made against him in the complaint, but we held the rule not applicable because "the propriety of his charge was placed in issue by himself": 162 Or at 241. In that case the lawyer claimed that he had the right to retain the money which he was charged with embezzling as a reasonable attorney's fee. There is no similar situation here. The Bar has also cited *In re Complaint Oren R. Richards,* 202 Or 262, 274 P2d 797. The lawyer in that case was charged with entering into an exorbitant fee contract, namely, one-half of the value of a statutory homestead, or $2,500, "for giving attention to a relatively simple ex parte proceeding which was shortly concluded favorably to his client": 202 Or at 263. The attorney was disciplined. The case was wholly different from the present one.

Not only is there no charge here that the fee was exorbitant, but the services were rendered in a litigated case, the outcome of which the uncontradicted

evidence shows was extremely problematical. Walton was in jail on a criminal charge. He was a drunkard, and a bootlegger and was soon to be a convicted felon. He had lived with the woman without benefit of clergy for several years before the date of the alleged marriage. He lived with her for seven days thereafter and she died within 30 days. Little testified:

> "* * * I realized after I talked with him that it was a very difficult and a very problematical case, and in view of the fact that the woman had been so promiscuous and had been so loose morally, and in view of the fact that the word come [sic] back to us that they were all drunk at the time that the services were performed over there in Washington, and in further view of the fact that the attorneys were adamant, they said that they never were legally married, * * *."

King's testimony is to the same effect. The Bar has made no attempt to show anything to the contrary.

■ Nothing in the present record justifies us in considering any further the contention that the contingent fee contract was exorbitant or unconscionable. See *Goldstone v. The State Bar of California,* 214 Cal 490, 6 P2d 513, 80 ALR 701, with Annotation at 706.

The first of the "overt acts" charged relates to the four-party contract of December 10, 1959, under which Penney was to receive 12½ per cent of the recovery and King's share was reduced from 25 per cent to 12½ per cent. The Bar charges that this was the splitting of a legal fee with a layman and was the consideration for Penney's efforts to influence Walton's judgment in his relations with the accused. The latter is a vague accusation, as it neither alleges in what way Penney was to influence Walton nor that he in fact influenced him at all. The evidence is quite as nebulous. So far as the conspiracy charge is concerned,

the evidence is convincing that the agreement was not brought about by a conspiracy between Little and King. The agreement was prepared after a conference among Little, Walton and Penney and then brought to King by Little for his signature. King signed the agreement after Little explained to him that his share of the fee should be reduced because his work on the case was practically concluded, while Little would be rendering the future services required. It is difficult to understand why it should be assumed in the circumstances of this case that in December 1959 the attorneys were in need of the services of Penney or anyone else to influence Walton, since Walton made no objection to his attorneys retaining as their fee one-half of the moneys—some six thousand dollars— paid to them by the administrator of the estate, and there is no evidence that he had given any indication of dissatisfaction regarding the fee up to the time the contract of December 10, 1959, was entered into.

The proof is insufficient to support a finding that Penney was to be paid for influencing Walton, although it must be conceded that there is evidence which leaves the reason for the agreement in a state of uncertainty. The agreement stated that Penney's 12½ per cent of the recovery was for services "heretofore rendered and to be rendered by Penney to Walton," but Penney was positive in his testimony that he was to be paid for services rendered after the agreement was entered into. He testified that he took care of Walton for two years and when asked what the care consisted of, answered: "Fed him, clothed him, booze, eats, everything in this world."

During most of this two-year period Walton was living in Penney's house. His testimony upon this subject differs considerably from Penney's. He testified, without contradiction, that while living at Pen-

ney's house, Penney was "[b]ootlegging, selling goof balls, * * *. I was bootlegging for him." Walton explained that he knew a lot of the Klamath Indians and that was why he was bootlegging for Penney as he sold whisky to the Klamath Indians. Moreover, while Penney was acting as conservator Walton received $25 a week from Little out of which he paid Penney $10 a week rent. It further appears that the probate court approved payment by Farquharson, as conservator, of a grocery bill in the amount of $1,558.27 for groceries purchased by Walton commencing on November 11, 1959, and ending on May 11, 1961—covering the entire period of time from the execution of the four-party agreement until Penney and Walton went to the penitentiary. If Walton can be believed, the services were the other way around.

Notwithstanding the failure to prove the purpose as alleged of the agreement to pay money to Penney, the question remains whether, as the Bar contends and the accused deny, the agreement contemplated a division of the attorneys' fee with a layman. Other evidence in the record sheds light upon that question.

In July 1961 Penney was in jail in Astoria on a criminal charge. He sent for King. Before King left for Astoria, the office secretary delivered to him a typed note reading as follows:

"When you see Verle Penney, find out if he has any notes for money he has loaned to Billie. Mr. Little said he has talked to Billie and he is willing to pay the money due under your agreement with him, but he wants to be sure Verle isn't holding additional notes."

The original note is in evidence and was identified by both King and the secretary who typed it, as she testified, under instructions from Little.

While in Astoria, King took up the subject of the note with Penney and as a result of their discussion King wrote out for Penney's signature, and Penney signed, the following letter, addressed to Little:

"This is to advise you that in reference to the conservatorship of Billie Walton I will consider myself to be paid in full upon receipt of one-eighth (⅛th) of the total fee to be set by the Probate Court of Multnomah County, Oregon, and this is to be in place of the percentage heretofore agreed upon between you, Stephen M. King and myself."

This letter was either mailed to Little or delivered to him by King upon his return to Portland.

After receiving from the conservator the check for the balance of the fee, Little paid Penney $1,400, approximately one-eighth of $11,227.42, apparently the "total fee" referred to in Penney's letter to Little which was drafted by King. This was less than the amount Penney would have been entitled to under the four-party agreement of December 10, 1959—12½ per cent or one-eighth of all moneys collected by Little. As a result of the decrease in Penney's portion, King's portion was increased from $2,806.10 to $4,209.15.

Regarding the Astoria incident King testified that at the time he took up with Penney the matter of his claim against Walton he had not thought about the agreement of December 10, 1959, for a year and a half and had no recollection of its contents. He was unable to explain how he "happened to use" the words "one-eighth (⅛th) of the *total fee to be set by the Probate Court*" (italics added) in the letter which he had prepared for Penney's signature.

Little, who testified upon this subject before his note to King was produced and the testimony of King and the secretary concerning it received, denied that he had ever requested King to obtain a statement from

Penney regarding his claim against Walton. Other testimony given by Little upon this subject is of such extraordinary character in view of the established facts that we quote from it at length:

"MR. HIGGINS [counsel for the Bar]: Q Now, Mr. Little, I would like to have you tell the Committee what you know about why Verle Penney considered himself to be entitled to any portion of the legal fees received by you or by Mr. King or by both of you in connection with this Billie Walton matter.

"A Well, that was a matter between King and Penney. I didn't—he didn't get any part of the —my half of the fee.

"Q Well, just—

"A And as far as I know, why Walton had given him a power of attorney to represent him, and as a matter of fact he represented him throughout all of this period of time. Penney had Walton under his wing, so to speak, and—

"Q But just—

"A Now, you wanted to know what I wanted to say about it.

"Q All right.

"A And so my best information is, I don't know for sure, but I think that King decided that Penney was still—had Walton under his wing and was really feeding him at times and taking care of him, and he wanted to, apparently, be sure that he was going to get part of the money.

"Q But what do you know from Stephen King of any arrangement between himself and Verle Penney?

"A I don't know.

"Q But you did honor this letter that was mailed up, I take it?

"A Well, I surely did because that is the way King wanted it.

"Q How do you know that's the way King wanted it?

"A Well, I just took it for granted that was the way he wanted it. He wrote it up and had Penney sign it.

"Q Now, the letter is dated July 28, 1961. At that time hadn't you paid Stephen King any fees that were coming to him?

"A I paid him half up to the last $11,000 that was paid.

"Q Didn't you pay him half of that?

"A It was paid but it was paid in two checks. Steve got a check for half of it, less $1400, and Penney got the $1400, and I made that check payable to both of them.

"Q Had you made that check out before you got this letter?

"A No, sir, I did not. That letter is dated in 1961.

"Q All right. But this is a letter from Verle Penney now. What made you think that this was the way that Stephen King wanted it?

"A Well, as I told you, it was my surmise. I can't say definitely what happened between them because I wasn't down at Astoria at the time. I don't know what happened, but I know that King was down there and I know that he was representing Penney in a criminal proceeding."

Elsewhere in his testimony Little swore that it was not Walton's money that was paid to Penney, but legal fees that were coming to King; that Walton got his fifty per cent; that there was no agreement between King, Penney and himself for a division of the fees to be set by the probate court; that it was "perfectly agreeable to me if King wanted to pay over part of his fees, but I don't think that's the way it was at all" and that "I wouldn't participate in a division of fee

and I don't think Mr. King would." Little further testified:

"Q As a matter of fact, at that time [1959], Mr. Little, hadn't you yourself drawn up an agreement with Mr. King for the reduction of his fee?
"A No, sir, not that I know of.

"Q Do you have such an agreement in your files, Mr. Little?
"A Not that I know of, but I am absolutely positive I never went to Mr. King at all. Steve was down at Astoria and that was then between King and Penney.

"Q You are sure of that?
"A I am sure. That was a matter that Penney and King pre-arranged themselves.

"Q In 1959?
"A I have already testified, I think, and maybe I can repeat it, that my best judgment is that—

"Q We have heard—
"A Yes, you heard what I testified to. Well, that's the facts in the case. I didn't reduce my fee a penny.

"Q What I tell you doesn't refresh your recollection that you drew up an agreement lowering the amount of fee that Mr. King was to have from the balance coming from the Indians?
"A I didn't lower it at all. That was a matter between King and Penney."

Later in the hearing a copy of the four-party agreement dated December 10, 1959, was produced and identified by King. After that Little resumed the stand and testified on direct examination that he had found in his file the original agreement, that he knew it was there all the time. Asked on cross-examination why, when he was previously asked about it, he denied making any such agreement, he answered that he did not remember being asked about it, adding: "I don't

intend to be evasive about it, because I had it all the time, and I expected to present it here in evidence."

Little was, to put it mildly, an unreliable witness.

Little's effort to shift responsibility from himself to King for the division of King's portion of the fee with Penney is, of course, fruitless, since he drew the agreement after discussing its provisions with Walton and Penney; but his first statement that the transaction was in fact a division of a fee rather than his second that it was not is, we think, in accordance with the fact. It cannot be disputed that by the terms of the agreement King's portion of the fee was to be cut in half and Penney was to receive the other half. If, as counsel for King argue, Penney's share was to be paid by Walton to compensate Penney for his services to Walton, it would follow that when Penney's share was voluntarily reduced by him the difference between the amount he was entitled to under the contract and the reduced amount he asked for in his letter written in the Astoria jail would have been Walton's, not King's, yet it was paid to King. The simple fact is that, since the four-party contract made no change in Walton's share as fixed by the contingent fee contract, he had nothing to bestow upon Penney. Money for Penney could come only from the attorneys' fee. That it came from King's share of the fee by no means excuses Little, who, the evidence shows, engineered the deal and induced King to accept a reduction in his share because his work in the case had practically come to an end.

██ We hold, therefore, that the accused did enter into an agreement, which was carried out in part, to divide their fee with Penney, a layman. We further hold that the proof fails to establish the conspiracy alleged in the amended complaint or that the purpose of

the payment of money to Penney was that alleged in the amended complaint. Nevertheless, we are of the opinion that the allegations of the amended complaint are sufficient to advise the accused of the charge of fee splitting as an independent offense.

Although the power of attorney which Walton gave to Penney is not one of the "overt acts" charged, the Trial Committee found that the accused kept Walton under their control by this means and that the accused knew that Penney controlled Walton for the purpose of getting a part of Walton's money (Amended Findings of the Trial Committee No. 7). To support this finding the Committee cites Little's testimony above quoted with reference to the Penney power of attorney and in which he said that King had decided that Penney had Walton under his control. Little's testimony in this regard is utterly unworthy of credit. The power of attorney to Penney was prepared by Little and, so far as the record shows, King did not know of its existence. The provision that it was subject to the "direction and control" of Little and King demonstrates an intention on Little's part to control Penney in the exercise of the powers granted and thereby, we assume, to control the disposition of the moneys, including their own fee, when they should be paid. But it is a *non sequitur* to treat the power of attorney and Little's testimony as evidence that the accused were using Penney to control Walton's judgment.

The remaining charges relate to the conservatorship and the conduct of the accused after it was established. Here the central charge is that the accused deprived Walton of independent legal representation by purporting to act as attorneys for Walton and the conservator and, "while so doing" committed certain "additional acts."

It is first to be observed that there is no evidence whatever that King either purported to act or acted as attorney for the conservatorship. Before May 1960, when Penney was appointed conservator, the relationship between Little and King had become strained because, among other things, of unfairness, as King viewed it, on Little's part in the division of the fee paid out of the moneys received from the administrator of the estate of Seda Walton, deceased. In December, 1961, the attorneys parted company, King moving his office into another building. Little was the sole attorney of record for the conservator and he alone had any dealings with Walton as his attorney after Penney's appointment as conservator.

■ The evidence as to the "additional acts" discloses a course of conduct not in accord with the accepted standards of professional ethics. Penney, a man of low character and wholly unqualified for a position of trust, should never have been selected as conservator and we are confident would not have been appointed had Judge Dickson known as much about him as did Little. Like the guardian of the estate of a minor, a conservator "should be selected for his good character, sound judgment, prudence, and adaptedness to the trust." Woerner, Guardianship, 100, Sec. 32. Penney's lack of character qualifications, it is true, is not made the basis of any charge in the amended complaint, although it is relevant in the question of Little's motives and purpose. We think that it was his purpose to control the conservatorship and that he did control both Penney and Farquharson.

■ It was, of course, improper for Little to continue in his capacity as attorney for the conservator after Walton disputed payment of the fee and the accused filed their notice of attorneys' lien and, particularly,

after they filed suit against Walton and the conservator. It then became Little's duty not only to resign as attorney for the conservator, but also to notify Walton, an ignorant man, that he could no longer represent him and that Walton should secure independent legal advice.

■ It was improper to aver in the proof of claim, in the notice of attorneys' lien, in the complaint filed against Walton and the conservator, and in various representations to the probate court, that the accused were entitled to the entire balance owing on the attorneys' fee and to fail to disclose the agreement with Penney to share the fee with him. These false statements were a violation of the oath which an attorney takes to "never seek to mislead the court * * * by any artifice or false statement of * * * fact," ORS 9.460(4). It is difficult to avoid the conclusion that this lack of entire honesty with the court was due to the consciousness that the fee splitting agreement was unethical. Finally, no defense is offered by able counsel for Little for the latter's misconduct in inducing the conservator to sign a check in favor of King and Little for the full amount of the fee after the judge had informed Little he would not approve its payment. Not only was this done in defiance of the court's announcement, but, subsequently, Little misled the court when in moving for the closing order he failed to disclose that the fee had been paid by the conservator. King, it should be added, knew nothing of what had gone on between the court and Little, and had no part in the transaction except to receive his share of the fee.

In addition to his other failings, Walton was a spendthrift, and we are of the opinion that Little, sensing that if Walton ever got the money from the Bureau of Indian Affairs in his hands none of it

might ever reach the hands of his attorneys, resorted to various devices to forestall such an untoward denouement. It may be that in dealing with a client of Walton's character actions could justifiably be taken by an attorney to insure the payment of his fee that in the ordinary case would never be thought of, but the end may not be used to justify the means, and some of the means employed in this case were unethical.

As we indicated earlier in this opinion, the evidence is not such as to convince us that the agreement to pay part of the fee to Penney was made for the purpose charged by the Bar, that is, to compensate Penney for influencing Walton's judgment in his relations with the accused. Whatever the purpose may have been, it was a violation of Rule 20 of the Rules of Professional Conduct of the Oregon State Bar, which reads:

> "A member of the state bar shall not divide fees for legal services except with another lawyer, based upon a division of service or responsibility."

Substantially the same provision is found in Canon 34 of the Canons of Professional Ethics of the American Bar Association. It would seem that disciplinary proceedings against a lawyer for dividing his fee with a layman have usually involved payments to laymen for referring or "running" cases for the lawyer, Annotation, 6 ALR3d 1446. Such cases may present circumstances that add to the gravity of the offense. There is no claim here, of course, that Penney was being paid for bringing Walton's case to the attorneys, and, in view of the uncertainty surrounding the reason for the agreement, we should not consider it a very serious breach of the rule, though, of course, it would call for discipline of some sort.

The unprofessional conduct following the establishment of the conservatorship is, however, in a different category, at least as far as Mr. Little is concerned.

Mr. Little will be 81 years of age in October of this year. He was admitted to the Oregon Bar in 1911 and has practiced in Portland ever since. Previous to the present proceeding no charges had ever been made against him by a client or anyone else. If he manifested in the Walton case something of irresponsibility in his duty to the court and to a client, it may yet be said for him that there was no intention on his part to deprive his client of a single penny to which he was entitled and his client received all that was due him. We think that suspension of Mr. Little for one year will vindicate the ends which a disciplinary proceeding is instituted to achieve.

Mr. King is 50 years of age. He was admitted to the Bar of Oregon in 1941, served four years in the armed forces, was a deputy city attorney for Portland for one year and for one year served in the Legal Department of the United States Postoffice in Washington, D.C. Since 1948 he has practiced his profession in Portland. He has served on a number of committees of the Oregon State Bar and the Multnomah Bar, among them a grievance committee of which he was chairman and a Multnomah Bar committee dealing with judicial candidates. In a number of instances he has been selected by attorneys to arbitrate their clients' controversies. He bears an excellent reputation for honesty and integrity.

Though Mr. King took a part in some of the improper conduct it was not an active part. Everything was set in motion by Little and King went along without apparently giving thought to the ethical questions involved. He should have given them thought and the

fact that he was merely negligent cannot serve to exonerate him completely. Our judgment is that he should be publicly reprimanded and this opinion will serve that purpose.